# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-KA-01985-SCT

*JAMES "DOC" CASTON, CHARLES E. CASTON a/k/a CHARLES ERNIE CASTON AND HAL SPIVEY CRIMM a/k/a HAROLD SPIVEY CRIMM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/17/1999 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JULIE ANN EPPS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | JAMES H. POWELL, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/23/2002 |
| MOTION FOR REHEARING FILED: | 6/19/2002; denied 8/15/2002 |
| MANDATE ISSUED: | 8/22/2002 |

## BEFORE SMITH, P.J., DIAZ AND EASLEY, JJ.

### EASLEY, JUSTICE, FOR THE COURT:

¶1. The case before this Court addresses the 1970 death of Rainey Pool (Pool), a one- armed man. In 1970 a number of individuals were indicted in connection with the beating and ensuing death of Pool. However, an order granting nolle prosequi was entered by the circuit court in July, 1970. After more than twenty-eight years, five men[1] were indicted for the murder of Pool in 1998. Two of the five men had severed trials. On June 30, 1999, Dennis Newton (Newton) was tried and found to be not guilty of murder by a Humphreys County jury. On August 2, 1999, Joe Oliver Watson (Watson) entered a guilty plea for manslaughter. The trial court continued the sentencing of Watson until the October 1999 term of court.

¶2. On November 10 through 13, 1999, James "Doc" Caston (Doc), Charles Ernie Caston (Charles) and Hal Spivey Crimm (Crimm)[2] [hereinafter Doc, Charles and Crimm collectively will be called "the

brothers"] had a joint jury trial in the Circuit Court of Humphreys County, Mississippi, the Honorable Jannie M. Lewis, presiding, for the death of Pool. Doc, Charles and Crimm were convicted of manslaughter by an unanimous jury. All three men were sentenced to serve a term of twenty (20) years in the custody of the Mississippi Department of Corrections. From that conviction and sentence, Doc, Charles and Crimm jointly appealed to this Court.[(3)]

## FACTS

¶3. Newton, Watson, and Doc testified to varying accounts of the events that occurred on the night of Pool's death. The testimonies mainly differed as to the amount of involvement in the beating and which people were present at the scene.

¶4. Dennis Newton (Newton) was a bartender at Jimmy Williams's lounge in Louise on April 11, 1970. Newton was charged in the case and found not guilty in June 1999.

¶5. According to Newton, on that night, about 30 to 40 people were in the bar shooting pool. It was hot and the air conditioner was not working, so the blinds and windows were open in the bar. Newton and Doc saw Pool with his arm in the bed of Doc's truck. Doc ran out the door. Doc told Pool to get out of his truck. Newton testified that Pool "got smart with [Doc], kept smarting off. So, Doc hit him one lick." When Doc hit him, Pool fell down and then "Hot Sanford [(Hot)][(4)] ran over and kicked him upside the head a couple of times, had on a pair of brown corduroy house-shoes." Pool was dragged to the side of the liquor store attached to the bar. [(5)]

¶6. A little later Newton, Jimmy Williams (Williams) and the eight-year-old son of Williams went out and poured a soda on Pool. They knew Pool was alright, so they went back inside the bar. A few minutes later Pool came to the front door and was told to go away. Somebody grabbed Pool and led him from the bar.

¶7. Newton later went to Williams's car to get some change. Newton opened the trunk and then opened the money box. Pool came from the shadows of the cotton gin, which was located to the right of the bar. Newton pulled a rifle from the back of the car and told Pool not to come over to him or he would shoot Pool. Pool asked Newton who had hit him. About that time Doc and Charles came out of the bar. Newton was not sure who else came out of the bar.

¶8. Doc told Pool that he had hit him. Pool ran toward Doc to hit him. Charles hit Pool one time, then Doc hit Pool and knocked down Pool. Pool got up and "came at" Doc again. Doc hit Pool and knocked him down again. Doc hit Pool in the face these two times. However, Newton could not see where Charles hit Pool.

¶9. When Pool was knocked to the ground, Charles told Doc not to hit Pool anymore. At this point, Watson came and kicked Pool a couple of times in the head and a couple of times in his body. Newton stated "Well, y'all back off and let me shoot him, the S-O-B." Doc stated "Do what you want to. I'm through with him." Then Doc and everyone walked back and inside the bar.

¶10. Newton stated that he probably saw Crimm but that he did not see Crimm do anything. Newton saw Doc, Charles, Watson, and Hot strike Pool. Newton testified that Doc and Charles walked into the bar in front of him. Newton did not see Watson and Crimm anymore that night. Newton also testified that he could not remember whether he ever saw Crimm outside on either of the two occasions.

¶11. On cross-examination, Newton testified that Pool acted like he had been drinking, Doc hit Pool in the face only, and he did not actually see whether Charles struck Pool. Newton stated that Pool did not appear to have any severe injuries due to the blows from Doc. Also, Newton stated that Doc and none of the men seated at the table beside him (i.e., Charles and Crimm) ever struck Pool while he was on the ground. Newton saw Watson kick Pool twice in the head and twice in the body, and he saw Hot kick Pool twice in the head when Pool was on the ground. Newton did not see Doc or Charles go outside the remainder of the night, and he never saw Crimm touch Pool. On redirect Newton stated that he did not know whether Doc or Charles went outside again that night.

¶12. Watson testified that Doc, Charles, Crimm, Newton and he were involved in a fight with Pool on April 11, 1970. According to Watson, all of them hit and kicked Pool for about ten minutes. About thirty minutes later the same five men, including Watson, went outside again. Watson stated that all five of the men were hitting and kicking Pool for about five minutes.

¶13. Watson stated that all five of the men were hitting and kicking Pool at one time or another while he was on the ground. Watson thought it was Crimm's idea to load and carry away Pool. After the beating, Watson thought Pool was unconscious, but he did not know if Pool was alive or dead and could not tell whether Pool was breathing. Watson then stated that he and Crimm loaded Pool into Watson's pick-up truck and took Pool to the Sunflower River. Pool was then thrown into the river.

¶14. Candy Bradshaw, a former girlfriend of Doc's son, testified that, in 1986 while she was at Doc's house, Doc stated that he had killed a black man, gotten away with it and that he would not hesitate to do it again.

¶15. James Caston, Jr., son of Doc and nephew of Charles and Crimm, testified for the defense. James testified that he and Candy never went to Doc's house.

¶16. Doc was the only defendant who testified at trial. According to Doc, a week before he went to the bar, tools were stolen out of his truck. He asked the patrons of the bar to keep an eye on his truck if they went outside because he had the tools stolen.

¶17. Newton told Doc someone was in his truck. Doc went outside and saw Pool. Doc and Pool knew each other. Doc asked Pool why he was in the truck. Doc stated that Pool came toward him and that Pool was mad. Doc hit Pool in the mouth, and Pool fell down. Doc bent over Pool and his breath smelled like he had been drinking, probably moonshine.

¶18. Charles came out of the bar, and Doc grabbed him and pushed him back toward the door. Then Hot went by Doc and began kicking Pool while wearing house shoes. Doc and Watson laid Pool under a light by the whiskey store.

¶19. Later, Doc went out to check on Pool. Doc stated that Pool ran toward him and lunged at him. However, Pool hit the ground, but Doc had not hit him. Then Doc and Watson moved Pool near the gin so that no one would run over him and no one could see him. Doc stated that he had trouble keeping other people from jumping on Pool.

¶20. When they laid Pool down, Doc stated that Pool asked who had hit him. Doc told Pool that he had hit him. Pool turned around and "started at" Doc again. Doc hit Pool in the mouth. At this point, Newton told everyone to get back and he would kill the S.O.B. Then, Watson began stomping Pool in the throat.

Watson wore heavy work boots, western boots with big heels. The second time Watson stomped on Pool's throat, Doc told Watson that he was killing Pool.

¶21. Doc stated that he went back inside with Newton. Doc then sat down beside Crimm. Doc also stated that Charles was in the bar and had not been outside the building nor touched Pool. Doc asked Williams if he had called the law, and Williams stated that he had called them. A few days later Doc was arrested. Doc denied knowing Bradshaw and making any statement about killing anybody.

¶22. Dr. David Steckler (Steckler), is the pathologist who performed the original autopsy on Pool's body in 1970. Pool had one arm. Pool had multiple face, neck, chest and arm abrasions. In addition, his T-3 vertebrae and larynx were fractured and there was some hemorrhaging of the brain. At the time of the autopsy, there was a question as to whether Pool was dead or alive at the time he entered the water. He had enough damage to his larynx and brain to cause death but the condition of his lungs suggested that he may have been alive when he went into the water. Steckler testified that, upon reviewing the autopsy findings again, Pool was probably alive when he went into the water. However, the injuries were enough to cause death regardless of whether Pool was placed in water. Steckler submitted an addendum report in 1998. The injuries to the larynx were consistent to being kicked, choked or grabbed. Pool had a blood alcohol content of 220 milligrams per hundred milliliters of blood. Steckler testified that the actual cause of death was drowning.

¶23. Dr. Steven Hayne (Hayne), a forensic pathologist, reviewed the earlier case findings. Hayne testified that the injuries that Pool sustained to the brain would have been fatal. He stated that the water in the lungs was suggestive of freshwater drowning, but Pool could also have been dead at the time he entered the water. The injuries to Pool were consistent to blunt force trauma which included repeated blows. Also the injuries to the neck were consistent with strangulation, kicking to the throat or being hit with a fist.

¶24. The brothers raise the following issues on appeal:

**1. Whether the appellants were represented by counsel with a conflict of interest in violation of their right to counsel.**

**2. Whether the trial court and prosecutor committed reversible error in failing to ensure that appellants had conflict free counsel.**

**3. Whether the trial court committed reversible error in denying a severance.**

**4. Whether the trial court erred in admitting evidence of the prior and allegedly consistent statements of Watson and Newton.**

**5. Whether the prosecutor committed reversible error when he allegedly misrepresented Watson's parole eligibility to the jury.**

**6. Whether the trial court erred in sustaining the prosecution's objection to defense counsel's questions to Watson designed to show his belief about his parole eligibility.**

**7. Whether the trial court erred in overruling the appellants' motion for a mistrial when the prosecution questioned Doc Caston about his wife.**

**8. Whether the trial court erred in overruling the appellants' motion for mistrial when the prosecution asked Doc Caston about statements Crimm allegedly made to his wife.**

**9. Whether alleged prosecutorial misconduct warranted reversal.**

**10. Whether potential jury misconduct warranted reversal.**

**11. Whether the trial court erred in denying appellants' motion for mistrial for alleged jury misconduct.**

**12. Whether the trial court erred in allowing a *Batson* challenge for venire person Duett.**

**13. Whether the trial court erred in excusing venire person Pepper for cause.**

**14. Whether appellants were deprived of a fair trial by the prosecution's reference to Doc Caston's failure to make a post-arrest statement.**

**15. Whether a thirty-year delay in prosecution violated the appellants' right to speedy trial, due process and right against double jeopardy.**

**16. Whether the trial court erred in the instructions to the jury.**

**17. Whether the appellants had ineffective assistance of counsel.**

## DISCUSSION

### *The Severance Hearing*

¶25. The severance hearing bears on the analysis for the first three issues on appeal. At a pretrial motions hearing, the record reflects the following arguments concerning the motion for severance:

The Court: Okay. Well, let's do the motion for severance. I understand there's no objection by the State on Watson and Newton. So, the only one we need to take up is whether or not your three clients' [Doc, Charles and Crimm] trial should be separate. Okay

The Defense: The Court care to hear from me --

The Court: Yes.

The Defense: -- with regard to the severance issue, Your Honor, of the co-defendants?

The Court: Correct

The Defense: The fact that they have a common attorney should not preclude them of their actual right to a fair and impartial trial. For the same reasons that this Court would consider granting a severance for two defendants, it should grant a severance for all defendants individually.

It may be that if they're going to be treated differently -- and I don't submit the Court would do that, but I'll, just for the sake of argument, say that it might behoove them to get additional counsel, but -- so they can get the same treatment as somebody that does have one lawyer.

The fact that I have the fortune or misfortune to be representing all three of them should be of no moment to the Court with regard to their individual rights to severances for trials on their own merits. Each case, as the Court I'm sure -- as statement in this case is given, the involvement to some degree is greater than some than there is others. And I think because of this -- and now I'm spilling over into some of my motion, Your Honor, but they're each entitled to trials in their own right. If the Court would give one that right, it should entertain giving all five of them the exact right.

The Court: Okay. State.

The State: Well, generally, when there's a severance, the reason for the severance is that there are conflicting defenses or conflicting statements between parties. A severance is not required where there's a unity among defendants as to their defense, and there's been no statements where one conflicts with the other.

I'll say this: If that's the case, I mean, if it's based upon conflicting statements and they're entitled to a severance, then I think they're required to have different attorneys. I mean, because if [the Defense] can represent all three of them, then he's representing folk with different interests and different claims and he can't legitimately do that before this Court. I mean, if the claims are so different that they had to have separate trials in order to secure a fair trial, then they need separate attorneys to handle those claims. And he, by being here, is representing to the Court that he can represent all three of these folk. If he can represent all three of them, in the interest of judicial economy and time, then we need to go forward with that trial combined.

The Court: Why is there is no objection between the severance on Watson and Newton from the other three?

The State: Because Newton has clearly made a statement that inculpates himself and the other defendants, and the other defendants have a right not to be tried and bound by that statement.

Watson has made a statement that inculpates himself and the other defendants, and the other four defendants have right to be tried and not bound by that statement. All right.

They can assert -- the other defendants could assert claim separate and apart from what Watson and Newton have said in their confession. As to the Castons and Crimm, if that's the case, that's fine. If he's claiming that we have separate defenses and what he says incriminates me, that's fine. But it's a conflict, I think, for an attorney -- you grant -- you grant relief from representation in those cases all the time where an attorney says "I've got one client putting it on the other." That's the basis for severance. That's why cases are severed. That's why Watson is severed and that's why Newton is severed. And if that's the case, [the Defense] shouldn't be representing all three of them, I mean. Now, if he wants to get up and say they got those type conflicts and if he wants to go forward and represent all of them in separate trials, then I think there's a conflict of interest problem there.

The court subsequently denied the motion for severance.

**1. Whether the appellants were represented by counsel with a conflict of interest in violation of their right to counsel.**

¶26. The brothers argue that their joint representation by one attorney was a conflict of interest because

their defenses were mutually antagonistic.

¶27. In *Stringer v. State*, 485 So.2d 274, 275 (Miss. 1986), this Court held:

> This Court readily recognizes the rule that effective assistance of counsel encompasses the right to representation by an attorney who does not owe conflicting duties to other defendants as set forth in *Glasser v. U.S.*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). However, the Court has repeatedly held that joint representation of co-defendants is not per se violative of the Sixth Amendment right to effective assistance of counsel. *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426, (1978); *Beran v. U.S.*, 580 F.2d 324 (8th Cir.1978); *U.S. v. Lawriw*, 568 F.2d 98 (8th Cir.1977).

In *Armstrong v. State*, 573 So.2d 1329, 1333 (Miss. 1990, this Court held that:

> It is well-settled that requiring or permitting one attorney to represent co-defendants, commonly referred to as joint representation, is not per se violative of the constitutional guarantees of effective assistance of counsel; however, prejudice is presumed if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance. *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638, 650 (1987) (emphasis added). This Court adopted the above standard in *Stringer v. State*, 485 So.2d 274 (Miss.1986), where it was held "[i]n order to demonstrate a violation of his Sixth Amendment Rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id*.

Indeed, this Court has recognized that one attorney may actually meet the needs of multiple defendants more effectively and the attorney can accomplish this task without violating any duty to his clients. *Smith v. State*, 666 So.2d 810, 813-14 (Miss. 1995)(citing *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426, 433 (1978)). When reviewing such a claim as asserted here, this Court in has set out a number of precautions to consider in evaluating an attorney's performance as follows:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134 [102 S.Ct. 1558, 1573-1575, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. New York, Supra, [350 U.S. 91] at 101 [76 S.Ct. 158 at 164, 100 L.Ed. 83]. There are countless ways to provide effective assistance in any given case.

*Stringer v. State*, 454 So.2d 468, 477 (Miss. 1984).

¶28. The brothers rely in part on *Carol v. State*, 540 So.2d 1330, 1333 (Miss. 1989), in which testimony

by two defendants jointly represented were in conflict. This Court in ***Carol*** held that "[t]he test is whether their defenses are in conflict with each other. This is important in determining both whether their trials should be severed and whether or not an attorney is placed in an unethical position having to represent them both." ***Id***. The Court further held that "[o]bviously, if the defenses are in conflict their trials should be separated and each defendant should have his own independent counsel." ***Id***.

¶29. The brothers cite ***Carol*** as a classic conflict example where both defendants blame the other. The brothers impart on a lengthy explanation as to what trial counsel could have argued and that it would be in Doc's and Crimm's best interests to blame the other for Pool's death. The State argues that its theory of the case was that all the brothers were guilty of murder. In addition, the State maintains that the defense's theory of the case is that none of the defendants were guilty. This Court agrees that the defense theory was none of the three brothers had any wrongdoing in the case. There was no proof of an actual conflict. At the severance hearing, there was no indication that there was any conflict by counsel as to the brothers, much less any argument that their defenses were mutually antagonistic, as later suggested by the brothers in their brief before this Court. As this Court warned in ***Stringer***, 454 So.2d at 477, an attorney's actions must be presumed to be within the wide range of professional assistance and it is far too easy to judge those actions throughout the proceedings in hindsight. The brothers in this instance have failed to demonstrate that their trial attorney's actions were anything other than sound trial strategy. Accordingly, this issue is without merit.

**2. Whether the trial court and prosecutor committed reversible error in failing to ensure that appellants had conflict free counsel.**

¶30. The next argument stems from the brothers' assertion that the trial court and the prosecution failed to ensure that they received conflict-free counsel. Stating this another way, the brothers claim that the trial court and the prosecution also have a responsibility to inform defendants of potential conflicts of interest. *See **Smith v. State***, 666 So.2d 810, 813-14 (Miss. 1995).

¶31. In ***Cuyler v. Sullivan***, 446 U.S 335, 346-47, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980), the United States Supreme Court addressed a court's responsibility to initiate an inquiry into cases involving multiple representation. The Supreme Court stated the following:

> Holloway requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in ***Holloway***, supra, at 485-486, 98 S.Ct., at 1179, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.' " 435 U.S., at 485, 98 S.Ct., at 1179, quoting ***State v. Davis***, 110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973). Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

¶32. At the severance hearing, the trial judge gave both sides an opportunity to argue the motion. As the excerpt reflects, there was never any indication that the brothers interests conflicted. The prosecution even

stated the following, in part:

> Well, generally, when there's a severance, the reason for the severance is that there are conflicting defenses or conflicting statements between parties. A severance is not required where there's a unity among defendants as to their defense, and there's been no statements where one conflicts with the other. I'll say this: If that's the case, I mean, if it's based upon conflicting statements and they're entitled to a severance, then I think they're required to have different attorneys.

Again, the opportunity to respond was given to both sides. There was no indication that a conflict existed. Accordingly, the trial judge did not have to delve further into the matter. This issue is without merit.

### 3. Whether the trial court committed reversible error in denying a severance.

¶33. The brothers argue that the trial court committed reversible error by denying their motion for severance.

¶34. A joint indictment of a felony does not entitle a defendant to separate trials. *Carter v. State*, 799 So.2d 40, 44 (Miss. 2001). The grant or denial of a motion for severance is at the discretion of the trial judge. *Blanks v. State*, 451 So.2d 775, 777 (Miss. 1984). "The decision of the lower court to grant or deny a motion for severance is reversible only where it constitutes an abuse of discretion." *Jones v. State*, 710 So.2d 870, 876 (Miss. 1998). "Absent a showing of prejudice, there are no grounds to hold that the trial court abused its discretion." *Id*.; *Duckworth v. State*, 477 So.2d 935, 937 (Miss. 1985)(citing *Price v. State*, 336 So.2d at 1311, 1312 (Miss. 1976)).

¶35. This Court in *Strahan v. State*, 729 So.2d 800, 803 (Miss. 1998)(quoting *Hawkins v. State*, 538 So.2d 1204, 1207 (Miss. 1989)), set forth the following considerations for review:

> The trial judge has the discretion to grant a severance if it is necessary to promote a fair determination of the defendant's guilt or innocence. In *Duckworth v. State*, 477 So.2d 935, 937 (Miss.1985), this Court stated that there are a number of criteria to be used to determine if the denial of a motion for severance is proper. These criteria are whether or not the testimony of one co-defendant tends to exculpate that defendant at the expense of the other defendant and whether the balance of the evidence introduced at trial tends to go more to the guilt of one defendant rather than the other. Absent a showing of prejudice, there are no grounds to hold that the trial court abused its discretion. *Id*. at 937.

*See also Jones*, 710 So.2d at 876.

¶36. The brothers claim, now after the trial and upon appellate review, that they had mutually antagonistic defenses. According to the brothers, Crimm's best defense would be that Doc killed Pool. Doc's defense would be that Crimm killed Pool when the body was thrown into the river. As for Charles, counsel representing the brothers at trial, which is different than that on appeal, seemed to have no discernable strategy; however, Charles's best defense would be to blame Pool's death on both of his brothers.

¶37. Once again, judging the actions of counsel after the fact and formulating subsequent arguments as to the best trial strategy are viewed with caution. At the hearing there was never any indication that the brothers had mutually antagonist defenses. Further, the issue of severance was not raised in the brothers' motion for new trial and j.n.o.v.

¶38. At trial, Doc was the only defendant to testify. There was no indication that each witness was exculpating himself at the expense of the other brothers. To the contrary, Doc maintained that when Charles began to come outside, Doc pushed him back to the bar door. Later, Doc testified that Charles was inside the building and had not come out of it. As for Crimm, Doc testified that he never stated that he and Crimm had moved Pool's body. Later, Doc testified that Crimm never came into the parking lot. This is not to say that adverse testimony and contradictory testimony was not elicited, but Doc's testimony did not suggest that he intended to make his brothers culpable for any wrongdoing.

¶39. The severance hearing gave no indication of any conflicts between the brothers. There was no showing that the brothers were prejudiced by the denial of the severance. Accordingly, the trial court did not abuse its discretion in denying the motion for severance. This issue is without merit.

### 4. Whether the trial court erred in admitting evidence of the prior and allegedly consistent statements of Watson and Newton.

¶40. The brothers next complain that the trial court committed reversible error by admitting prior consistent statements of Watson and Newton. During the 1999 murder trial, Newton and Watson were both questioned about prior consistent statements, made in 1970 to the sheriff's office.

¶41. The brothers cite the prosecution's opening statement comments that Newton's and Watson's almost 30-year-old statements would be the same as their trial testimony. During the direct examination of Newton, the State wanted Newton to read his 1970 statement into the record because of "slight discrepancies" between the statement and his testimony. The brothers objected, and the trial judge allowed questioning, but not the admission of the statement. Later, the trial judge sustained the brothers' objection when the prosecution attempted to show the statement to the jury.

¶42. As to Watson's direct testimony, the prosecution asked "[t]he statement that you [Watson] made 30 years ago about the incident, has it changed at all from what you've told us today about what occurred?" Watson responded in the negative. There was no objection to this question posed by the prosecution.

¶43. Mississippi Rules of Evidence 801(d)(1) states the following:

(d) Statements Which Are Not Hearsay. A statement is not hearsay if:

(1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to **rebut** an express or implied charge against him of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving him...

(emphasis added). Therefore, M.R.E. 801(d)(1)(B) normally applies in rebuttal situations. "[A]dmission of a prior consistent statement of a witness where the veracity of the witness has been attacked is proper but should be received by the court with great caution and only for the purpose of rebuttal so as to enable the jury to make a correct appraisal of the credibility of the witness.'" *White v. State*, 616 So.2d 304, 308 (Miss.1993) (quoting *Stampley v. State*, 284 So.2d 305, 307 (Miss.1973)). However, this Court in *Clemons v. State*, 732 So.2d 883, 891 (Miss. 1999) held that a statement elicited by the State, who

questioned a witness concerning a guilty plea prior to an attack on his credibility, should have been excluded, but a reversal was not warranted. *Id*. In *Clemons*, this Court considered that the witness, Sudberry, was among other things the primary witness against Clemons, his credibility was key to the case, he was vigorously cross-examined and that despite the premature introduction of the plea it was unlikely that he would not have been attacked by opposing counsel. *Id.* Therefore, the Court found that when Sudberry testified to the plea on direct examination, "he added nothing to his otherwise competent testimony."*Id*. Accordingly, this Court did not find that the premature statements warranted reversal. *Id*.

¶44. In the case sub judice, this Court finds that eliciting prior consistent statements in the absence of a challenge to the witness's veracity should be given only for the purpose of rebuttal. The circumstances of this case, however, do not warrant a reversal. This issue is without merit.

> **5. Whether the prosecutor committed reversible error when he allegedly misrepresented Watson's parole eligibility to the jury.**

> **6. Whether the trial court erred in sustaining the prosecution's objection to defense counsel's questions to Watson designed to show his belief about his parole eligibility.**

¶45. In their fifth and sixth issues, which will be combined in this opinion, the brothers complain that the prosecution misled the jury concerning Watson's plea agreement. In addition, the brothers assert that the jury was not fully informed of a potential reason for Watson to falsify testimony. The brothers base this assertion upon the sustained objection by the trial court of the defense counsel's question concerning whether Watson believed that he had to serve the full four years of the agreement. However, it is important to include the direct examination testimony as well.

¶46. On direct examination the prosecution questioned Watson concerning his plea agreement with the State. The following exchange occurred:

> Q. I believe my question was that you have previously pled guilty to a manslaughter charge in connection with the death of Rainey Pool?

> A. Right.

> Q. And as part of that plea, there's a sentencing recommendation for your truthful testimony that we would make to the Court; is that correct?

> A. Correct.

¶47. Watson's relevant testimony on cross-examination by the brothers' counsel is as follows:

> ....

> Q. Did you enter into a plea in this case?

> A. Yes, sir.

> Q. And that plea was for manslaughter?

> A. Right.

....

Q. And you got manslaughter?

A. I reckon I did.

Q. What did they give you? How many years they give you?

A. Ask my lawyer.

Q. I'll ask you. Four years, right?

A. Right.

Q. That's true isn't it?

A. Right.

Q. I mean, you can flat time that in two years, can't you.?

A. I don't know.

The State: Your Honor, objection - -

Q. (By [defense counsel]) You can parole in one year, aren't you?

The State: If we could object before he continues asking questions, we object. And the Court well knows nobody can predict what parole or probation eligibility is in any case. That's up to the Department of Corrections.

The Court: The Objection is sustained.

Q. (By [defense counsel]) Now, Doc and Charles went back into the place didn't they, in Jimmy's place that night?

A. Oh, yeah.

Q. That was after you kicked that man in the head? They went ahead of Dennis Newton, didn't they?

A. I don't remember that.

Q. You don't know. Now, I know that you have made a deal with the State to come up here to testify and save your neck, but I want you to tell this jury what you remember and what you don't.

The State: Your Honor, and we would object to the argumentative tone of the question, to the phrase "to save your neck." **This man is going to do four years in the penitentiary at least.**

The Defense: Well, I object to counsel's observations.

The Court: Objections's - - -

The Defense: He objects to mine; I object to his.

The Court: Objection's sustained. Rephrase your question.

(emphasis added).

¶48. In his closing argument to the jury the prosecutor said, "Certainly Joe Watson pled guilty to manslaughter. He didn't get off with anything. **He's going to do four years in the penitentiary**." (emphasis added). There was no objection to this closing statement by defense counsel.

¶49. The brothers cite many United States Supreme Court cases and various federal circuit cases for support. In *Giglio v. United States*, 405 U.S. 150, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1970), the Supreme Court held that the credibility of a prosecution witness was instrumental in the case and that the jury was entitled to know of any agreements or understandings concerning future prosecution. In *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375,3380, 87 L.Ed.2d 481 (1984), the prosecution failed to disclose that two key witnesses had a contract for payment commensurate with the information provided against the defendant. The Supreme Court found that the witness had a motive to give false testimony since payment was contingent on the government being satisfied with the end result. *Id*. at 683. In *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), a prosecutor's failure to give defense counsel a victim's arrest record where defense counsel failed to request nor did it rise to an inference of perjury, did not deprive the defendant of a fair trial as guaranteed by the due process clause. *Id*. However, the brothers cite this case for the holding that the prosecution cannot rely on evidence that is false or that the government should have known was false. *Id*. at 103 (citing *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791(1935)).

¶50. This Court, in *Suan v. State*, 511 So.2d 144, 147 (Miss. 1987), has held the following:

> Evidence that a material witness has received favored treatment at the hands of law enforcement authorities, particularly where that witness is himself subject to prosecution, is probative of the witness' interest or bias and may be developed through cross-examination or otherwise presented to the jury. See *Malone v. State*, 486 So.2d 367, 368-69 (Miss.1986); *Hall v. State*, 476 So.2d 26, 28 (Miss.1985); *Barnes v. State*, 460 So.2d 126, 131 (Miss.1984); *King v. State*, 363 So.2d 269, 274 (Miss.1978); *Sanders v. State*, 352 So.2d 822, 824 (Miss.1977).

This Court further held in *Suan* that:

> [O]ne accused of a crime has the right to broad and extensive cross-examination of the witnesses against him, and especially is this so with respect to the principal prosecution witness. *See Foster v. State*, 508 So.2d 1111 (Miss.1987); *Miskelley v. State*, 480 So.2d 1104, 1108-12 (Miss.1985); *Myers v. State*, 296 So.2d 695, 700 (Miss.1974). Not only is this right secured by our rules of evidence, see Rule 611(b), Miss.R.Ev., it is a function of the confrontation clauses of federal and state constitutions.

*Suan v. State*, 511 So.2d at 148.

¶51. In the case sub judice, Watson actually entered a plea agreement of manslaughter with the State. The terms of the petition to enter plea of guilty was for the district attorney's office to recommend a 10 year sentence with 6 years suspended. The trial court accepted the plea of guilty and postponed sentencing until the October 1999 term of the Humphreys County Circuit Court. On January 3, 2000, Watson was

sentenced to ten years imprisonment, six years suspended and 4 years to be served.

¶52. The testimony at trial revealed that Watson had a plea agreement with the State. Watson entered his guilty plea prior to the brothers' trial. The terms were disclosed to the jury. Watson's agreement to testify truthfully was disclosed on direct examination at trial. It was evident to the jury that Watson's manslaughter plea would give him a reduced sentence for his participation in Pool's death. Watson was a material witness, and the jury was aware that he received favored treatment at the hands of law enforcement authorities through disclosure of the plea agreement. The defense questioned Watson about the agreement and thus had the opportunity to probe into Watson's interest or bias in testifying at trial. Further, there was no known false testimony as to the terms of the plea agreement. The judge gave Watson a ten-year sentence with four years to serve. Whether Watson served four years as opposed to one year is inconsequential in the case before the Court. The jury was aware that Watson received favorable treatment from the prosecution via his plea agreement. The trial court did not abuse its discretion. Accordingly, these issues are without merit.

### 7. Whether the trial court erred in overruling the appellants' motion for a mistrial when the prosecution questioned Doc Caston about his wife.

¶53. The brothers next argue that the trial court erred in denying their motion for mistrial. The brothers based their motion upon questions by the prosecution pertaining to the circumstances in which Doc's wife left him after Pool's death.

¶54. "Whether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion." *Pulphus v. State*, 782 So.2d 1220, 1222 (Miss. 2001)(citations omitted); *Spann v. State*, 771 So.2d 883, 889 (Miss.2000); *Johnson v. State*, 666 So.2d 784, 794 (Miss. 1995); *Hoops v. State*, 681 So.2d 521 (Miss. 1996). "The failure of the court to grant a motion for mistrial will not be overturned on appeal unless the trial court abused it discretion." *Bass v. State*, 597 So.2d 182, 191 (Miss. 1992).

¶55. The record reflects the following testimony on direct examination of Doc by defense counsel:

Q. Well, did you ever tell anybody at any time you ever killed anybody?

A. No, sir, I have never told nobody; my wife, my children, or nobody else because I'd be lying on myself. I have never killed nobody and ain't intending to.

On cross-examination by the State, the testimony was as follows:

Q. Well, she [Doc's wife] left shortly after you murdered Rainey Pool, didn't she?

A. No, she didn't.

Q. And the reason that she left is because you told her one night during an argument that you had killed him and wouldn't mind doing it to somebody else, didn't you?

A. No.

¶56. During a bench conference, defense counsel moved for a mistrial based upon a prior court ruling. The defense maintained that the prior ruling made any statements by Doc's wife inadmissible. The State argued

that the order only prohibited calling the wife as a witness. Further, the State argued that the order did not prohibit asking Doc about the circumstances of the wife leaving, nor covering up the truth. The trial judge allowed the State to question Doc about whether he made the statement. The trial judge also gave the caveat that if Doc denied making the statement, then, the State could not question or state what the wife may have said in response.

¶57. Following the ruling, Doc testified as follows:

Q. The truth about why your wife left is that you made that statement to her, didn't you?

A. That is not a fact. I have never talked about this case to nobody; my children; my wife, or nobody else.

¶58. In the case sub judice, clearly, the defense opened the door for inquiry into the veracity of Doc's claim that he never told anyone that he had killed in the past. In ***Morgan v. State***, 741 So.2d 246, 254 (Miss. 1999), this Court has held that "[w]here an accused, on direct examination, seeks to exculpate himself, such testimony is subject to normal impeachment via cross-examination, and this is so even though it would bring out that the accused may have committed another crime." ***Stewart v. State***, 596 So.2d 851, 853 (Miss.1992). "[T]he prosecution's impeachment privilege may not exceed the invitation extended." ***Id.*** at 853.

¶59. Rule 613 of the Rules of Evidence states the following:

(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

M.R.E. 613(b).

¶60. The trial judge limited the questioning by the State. Once Doc denied making any statement to his wife, the State was not allowed to pursue further inquiry. Accordingly, the trial court was within its discretion to allow the State to inquire about the alleged statement by Doc to his wife in an attempt to impeach his prior testimony that he never told anyone that he had killed. The trial court limited the testimony and correctly ruled that if Doc denied making the statement then no further questions could ensue. Therefore, the trial court did not abuse its discretion in denying the motion for mistrial. This issue is without merit.

### 8. Whether the trial court erred in overruling the appellants' motion for mistrial when the prosecution asked Doc Caston about statements Crimm allegedly made to his wife.

¶61. The brothers next complain that the trial court committed reversible error when it denied a motion for mistrial pertaining to the prosecution's question concerning Margaret Berry's statement. The appropriate standard of review is outlined in the preceding issue.

¶62. During cross-examination of Doc, the following exchange occurred:

Q. Any you say your brother Harold [Crimm] was in the bar and never went out there [to the parking

lot]?

A. As I know of I said.

Q. Well, why would he have told Margaret Berry that he did, and that he took him [Pool] to the river?

A. I don't know.

¶63. Following this questioning, a bench conference ensued. Defense counsel requested a mistrial based on a court order prohibiting the State from mentioning any statements by Crimm's wife, Margaret Berry (Berry). The court denied the motion for mistrial based on the fact that Berry's actual statement was not given by the prosecution.

¶64. The State argues that the brothers did not request the trial court to admonish the jury to disregard the matter, consequently, the mistrial issue is precluded from review. The brothers assert that the trial court's instruction to the prosecution, to not go into any of Berry's statements, is the functional equivalent of telling the jury to disregard the evidence. However, the record reflects that the judge's limitation on questioning was given during the bench conference and not to the jury. Nevertheless, the brothers' failure to request an admonishment bars review of the motion for mistrial. When the trial court sustains an objection and admonishes the jury to disregard the statement, there is usually no error, "absent unusual circumstances." *Pulphus v. State*, 782 So.2d at 1223 (citing *Spann v. State*, 771 So.2d at 890. In *Gardner v. State*, 455 So.2d 796, 800 (Miss. 1984), the defendant alleged that the trial court erred by denying a motion for mistrial, and this Court held:

> When the prosecutor asked the question, defense counsel objected and the objection was sustained by the trial court. Defense counsel then made a motion for a mistrial, which was overruled. Since the trial judge sustained the first objection, no prejudice resulted to the appellant from the question. This court has held that where an objection to a question is sustained and no request is made that the jury be instructed to disregard the question, there is no error. *Reddix v. State*, 381 So.2d 999 (Miss.1980); *Clanton v. State*, 279 So.2d 599 (Miss.1973).

¶65. Likewise, in *McGowan v. State*, 706 So.2d 231, 243 (Miss. 1997), defense counsel made an objection which was sustained, and the motion for mistrial was overruled. The defense, however, failed to request the trial court to admonish the jury to disregard the prosecution's statement. *Id*. This Court held that "'[i]t is the rule in this State that where an objection is sustained, and no request is made that the jury be told to disregard the objectionable matter, there is no error.'" *Id*. (quoting *Marks v. State*, 532 So.2d 976, 981 (Miss. 1988)). Accordingly, this issue is without merit.

### 9. Whether alleged prosecutorial misconduct warranted reversal.

¶66. The brothers allege various instances of prosecutorial misconduct. In addition, defense counsel failed to object to many of the statements, which the brothers claim amounts to another example of ineffective assistance of counsel. In their motion for new trial and j.n.o.v. the brothers did not raise any of these claims.

### A. Misleading jurors about Watson's plea agreement.

¶67. This assertion was addressed in Issue 4 and found without merit. Therefore, no further discussion is

required on this point.

**B. Testifying that the statements Watson, Newton and Bradshaw were consistent and the Doc Caston's statement was not consistent without actually introducing the statements themselves.**

¶68. The brothers argue that without introducing the actual statements, the prosecutor erred by claiming that the statements of Watson and Newton were consistent with their statements made in 1970 and that Doc's statements were not consistent. The record reveals that the defense objected to the introduction of Newton's statement. The defense's objection as to Watson's testimony was overruled. As for Bradshaw, there was an interview statement to which the defense objected. To find that it is prejudicial for counsel to say that a statement is consistent with a witness statement without introducing the statements, when the defense objected to the introduction to the statements in the first place would be to find an error that the defense created. "Appellant has no standing to seek redress from alleged error of his own creation." *Evans v. State*, 547 So.2d 38, 40 (Miss. 1989). This issue is without merit.

**C. Injecting prejudicial hearsay by asking Watson if he knew of anyone else who had ever said that Doc had tried to stop Watson from beating Pool.**

¶69. The brothers complain about the following questions posed to Watson during his redirect examination by the State:

Q. [Defense counsel] asked you about some remarks that he says that Doc Caston made that night about telling you to quit. Did you ever hear Doc Caston ever say stop doing anything to Rainey Pool?

A. No, I didn't never hear him.

Q. **Okay. Do you know of anybody else that's ever made a statement in connection with this case who's ever said anything like that about Doc Caston?**

A. No.

(emphasis added). Clearly, this is an instance in which the prosecution was within the parameters of reasonable questioning on redirect examination. Furthermore, there is no hearsay in this case. Watson simply stated that he had no knowledge of any statements that are consistent with Doc's assertion.

**D. Appealing to the passions and racial prejudices of the jury in closing argument by telling the jurors that they should provide justice for Rainey Pool and the Pool family.**

¶70. The brothers list a long line of examples in which they claim the prosecution appealed to the passion and racial overtones or prejudices. After reviewing the examples cited by the brothers, the prosecution does not appeal to the passion or racial overtones of the case, rather he asked the jury for justice in the case. Therefore, this issue is without merit.

**E. Improper vouching for witnesses and expressing personal opinions of the guilt of the brothers.**

¶71. The brothers claim that the prosecution improperly vouched for witness at trial and expressed his personal opinions. "The standard of review that appellate courts must apply to lawyer misconduct during

opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." ***Sheppard v. State***, 777 So.2d 659, 661 (Miss. 2000).

¶72. The brothers cite many examples, all of which were part of the prosecution's closing argument to the jury. It must be remembered that an instruction number 1 was given, which stated that the closing arguments are not evidence and if a statement is made that is not based on evidence, then, the jury should disregard the statement. Most of the examples cited by the brothers dealt with statements prefaced by the prosecution saying "I think", "I know it", "I don't think" and comments that reference whether Doc was lying. In ***Bell v. State***, 725 So.2d 836, 861-62 (Miss. 1998), this Court held that:

> It has been held that a prosecutor may not use his personal beliefs and the prestige attendant to his office to bolster his argument or the witnesses or evidence which he deems most damaging to a defendant. ***United States v. Young***, 470 U.S. 1, 5, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); ***Dunaway v. State***, 551 So.2d 162, 164 (Miss.1989); ***Tubb v. State***, 217 Miss. 741, 745, 64 So.2d 911 (1953). He is, however, entitled to argue his case drawing all rational inferences which come from the evidence presented in the courtroom. ***Davis***, 684 So.2d at 656 (quoting ***Shell***, 554 So.2d at 900.) Bell's argument is similar to that made by the prosecutor in Chase, where we found statements such as "I think that Terry Washington told you the truth about everything she knew. I don't think she tried to hold anything back," and "I believe that I have proved to you beyond a reasonable doubt ... that that man ... shows absolutely no remorse," to be permissible deductions drawn from the evidence. ***Chase***, 645 So.2d at 855. Such deductions are to be distinguished from personal opinions which are not drawn from the evidence at trial. We cannot say that by introducing these observations with phrases such as "I think," or "we believe," the State spoils otherwise acceptable argument. See ***Knox v. State***, 502 So.2d 672, 675 (Miss.1987).

This Court has stated that "[i]t is not improper for a prosecutor to comment that the defendant was lying when the contention is supported in the record." ***Hull v. State***, *687 So.2d 708, 720 (Miss. 1996)(citing **Shell v. State**, 554 So.2d 887, 899-900 (Miss.1989); **Simpson v. State**, 497 So.2d 424, 431-32 (Miss.1986)). This Court has also held the following:*

> *Shell next contends that the prosecution improperly called him a liar during closing arguments. There are several references by the prosecution in which they characterize Shell as a liar. However, case law in this State runs directly contra to Shell's position. In **Simpson v. State**, 497 So.2d 424 (Miss.1986), the prosecutor made multiple references to the defendant as a liar. **Id**. at 431. In upholding the appellant's conviction, this Court held the following:*

> *In this case, the comment by the prosecutor was that the defendant was not telling the truth about the events of March 4, 1982. That can hardly be said to be an extraneous issue, since, if the State believed Simpson's story, he would not have been tried. There is no error here. 497 So.2d at 432.*

***Shell v. State**, 554 So.2d 887, 899 (Miss. 1989)(overruled on other grounds); See **Simpson v. State**, 497 So.2d 424 (Miss. 1986). In light of the above referenced cases and the fact that attorneys have wide latitude in closing arguments, this issue is without merit.*

### F. Misinstructing the jurors about the law regarding aiding and abetting.

*¶73. This assertion is addressed in Issue 16 and found to be without merit. Therefore, no further discussion is required on this point.*

### *G. Summary.*

*¶74. No prosecutorial conduct infected the trial. Therefore, any assertion as to the cumulative impact of the misconduct affecting the brothers due process and right to a fair trial are rejected. This issue is without merit.*

### *10. Whether potential jury misconduct warranted reversal.*

### *11. Whether the trial court erred in denying appellants' motion for mistrial for alleged jury misconduct.*

*¶75. The brothers next argue that the trial court erred in denying a motion for mistrial for alleged jury misconduct and interrogation by the bailiff.*

*¶76. The grant of a mistrial is left to the discretion of the trial judge. **Washington v. State,** 800 So.2d 1140, 1143 (Miss. 2001). "The standard of review for denial of a motion for mistrial is abuse of discretion." **Pulphus v. State**, 782 So.2d at 1222 (citations omitted); **Hoops v. State**, 681 So.2d 521 (Miss. 1996); **Johnson v. State**, 666 So.2d at 794. The failure to grant a mistrial is considered an error only where there is a determination of an abuse of discretion by the trial judge otherwise the decision will not be disturbed on appeal. **Madere v. State**, 794 So.2d 200, 218 (Miss. 2001); **Bass v. State**, 597 So.2d at 191.*

*¶77. "[T]he party contending there is juror misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality." **Gladney v. Clarksdale Beverage Co.**, 625 So.2d 407, 418-19 (Miss. 1993). "[W]henever there is a question concerning outside influencing of a jury, the trial judge himself ought to examine the jury carefully to ensure that the jury's deliberations are based on the evidence produced at trail and not extraneous matters." **Williamson v. State**, 512 So.2d 868, 882 (Miss. 1987) (overruled on other grounds).*

*¶78. On November 11, 1999, closing arguments were given and the jury retired for the evening. The next morning the judge informed counsel that the bailiff had contacted her and told her that three jurors were talking on the telephone. The telephones were disconnected to the outside; however, guests still had the ability to make room-to-room calls. The light for the telephone of a room shows up at the front desk. The lights did not indicate with whom someone was speaking, but rather, it showed that the telephone light was on in a room. The judge informed counsel that Juror Rowland appeared to be on the phone 10-15 minutes, Juror Hawkins was on the phone 5-10 minutes and Juror Jones appeared to be on the phone 15-20 minutes. The bailiff went to the three jurors rooms and inquired about the calls.*

*¶79. Upon hearing about these events, the brothers requested a mistrial based upon the communications between the jurors, which was contrary to the admonishments of the court, and had the resulting potential for prejudice. The trial court stated that it would speak to the jurors prior to ruling on the mistrial.*

*¶80. The three jurors were questioned by the judge. Rowland stated that he spoke to Hawkins on the*

*bus to the hotel. Hawkins told Rowland she did not have anything to wear except a thin T-shirt for the next day. That night Rowland called Hawkins to inform her that he had a Nautica pullover for her to wear the next day. Rowland denied speaking to Hawkins about the case. Rowland stated he was on the phone less than a minute. When questioned about the light being on for 10-15 minutes, Rowland stated that perhaps he had not hung up the telephone properly.*

*¶81. Hawkins stated that Rowland called and told her that he had a shirt for her to wear. Hawkins did not discuss anything else with Rowland. She thought that they were on the telephone less than two minutes. When questioned about the telephone light being on for 5-10 minutes, Hawkins stated that she did not look at a watch, but that she did not think she was on the telephone for that long of a period. It was noted in the record that Hawkins was wearing the same type of shirt described by Rowland.*

*¶82. Jones stated that she did not know who had called her room. However, the caller was not a jury member, but rather someone who had seen Jones in the hallway. Jones told the person that she could not talk and hung up the telephone. The telephone kept ringing, and Jones then took the telephone off the hook.*

*¶83. Based on the jurors' testimony the trial court denied the motion for mistrial. The trial court stated that it viewed the demeanor of all the three jurors. As to Rowland and Hawkins, the trial court found that their testimony corroborated one another and Hawkins was wearing the shirt described by Rowland. As to Jones, the trial court found her testimony to be credible. In addition, the bailiff told the court that she observed that the telephone was off the hook upon entering Jones's room.*

*¶84. The State maintains that the brothers did not assert an objection as to the bailiff's communication at trial. Rather the objection was for the jurors communication and not for the bailiff's questioning the jurors. In the alternative, the State submits that the bailiff's inquiry did not unduly influence the jury. Further, the record supports the trial court's denial of the mistrial. Again, the trial judge is in the best position to determine whether the jury as selected was fair and impartial, and thus its ruling should not be disturbed on appeal unless that decision is clearly in error.* **Fleming v. State**, *687 So.2d 146, 148 (Miss. 1997). The trial judge questioned each witness and determined that the communication did not concern the trial, no abuse of discretion occurred under these facts. Accordingly, this issue is without merit.*

### *12. Whether the trial court erred in allowing a Batson challenge for venire person Duett.*

*¶85. The brothers next complain that the trial court erred by allowing a* **Batson** *challenge for venire person Perry Duett.*

*¶86. A reversal will only occur if the factual findings of the trial judge are "clearly erroneous or against the overwhelming weight of the evidence."* **Tanner v. State**, *764 So.2d 385, 393 (Miss. 2000) (citing* **Stewart v. State**, *662 So.2d at 558);* **Davis v. State**, *551 So.2d 165, 171 (Miss. 1989). "On appellate review, the trial court's determinations under* **Batson v. Kentucky**, *476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), are accorded great deference because they are based, in a large part, on credibility."* **Coleman v. State**, *697 So.2d 777, 785 (Miss. 1997)(citing* **Lockett v. State**, *517 So.2d 1346, 1349 (Miss. 1987)). The term "great deference" has been defined in the* **Batson**

*context as meaning an insulation from appellate reversal of any trial findings which are not clearly erroneous.* **Lockett v. State**, *517 So.2d at 1349 (citations omitted).*

*¶87. The United States Supreme Court has held that a peremptory challenge cannot be used to exclude venire-persons from jury service based on their race.* **Batson v. Kentucky**, *476 U.S. 89, 106 S.Ct.1712, 90 L.Ed.2d 69 (1986). A peremptory challenge based on race violates the equal protection clause.* **Id**. *at 98.*

*¶88. The necessary steps to resolve a peremptory challenge based upon* **Batson** *are cited in* **Stewart v. State**, *662 So.2d at 557-58, as follows:*

> *1. The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge.*
>
> *2. If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror.*
>
> *3. The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges.*

*To establish a prima facie case under* **Batson**, *the objecting party must show (1) that he/she is a member of a "cognizable racial group," (2) the prosecutor has exercised peremptory challenges toward the elimination of prospective jurors of his race, and (3) the facts and circumstances raised and inference the prosecutor used his peremptory challenges for the purpose of striking minorities.* **Conerly v. State**, *544 So.2d 1370, 1372 (Miss. 1989).*

*¶89. In the case sub judice, venire persons first made the trial court aware of a hardship. Duett stated that he had to check his fish pond. The trial court gave Duett an hour to locate someone to check on the ponds.*

*¶90. The State struck nine venire persons, seven of whom were white, including Duett. The brothers invoked a* **Batson** *challenge against the State's strikes.*

*¶91. The State responded with the following reasoning:*

> *Mr. Duett is a lot like the challenge in Mr. Kiker. Mr. Duett lists his occupation as being a self-employed farmer, fish farmer, and of all the panels we've ever had over here where we had those folks on there, not a single one has ever failed to raise that and ask the Court to excuse them from the case on that basis. And since he did not raise that issue, didn't attempt to raise it, I just did not feel comfortable with him.*

*The trial court found the State's response to be a race neutral reason. The brothers did not offer any rebuttal statements for the strike against Duett nor raise this claim in their motion for new trial. Accordingly, this issue is without merit.*

### *13. Whether the trial court erred in excusing venire person Pepper for cause.*

*¶92. The brothers argue that the record does not support the trial judge's exclusion of venire person Susie Pepper (Pepper) and request a reversal by this Court. The brothers state that a juror's*

*reservation or difficulty in sitting on a jury is not sufficient grounds to support a challenge for cause. In support of their proposition, the brothers cite* **Martin v. State**, *592 So.2d 987, 988 (Miss. 1991) for this Court's holding that:*

> *In order to strike a juror for cause there must be a clear showing that the prospective juror would be unable to follow the court's instructions and obey his oath; a juror's views alone do not constitute grounds for a challenge.*

*Additionally, the brothers cite* **Woodard v. State**, *533 So.2d 418, 424 (Miss. 1988), for the proposition that a judge's ruling to exclude a juror, based upon an inability to sit in judgment, is upheld only where it is supported by the record.*

*¶93. The trial court has wide latitude in deciding whether to excuse a potential juror, including an exclusion for cause.* **Poe v. State**, *739 So.2d 405, 409 (Miss. 1999). The trial judge has discretion in determining whether to excuse a juror and such decision will not be set aside unless it is clearly wrong.* **Wells v. State**, *698 So.2d 497, 501 (Miss. 1997). This Court held the following in* **Coverson v. State**, *617 So.2d 642, 645 (Miss. 1993):*

> *On substantive grounds, statutory and case law empowered the judge with broad discretion to determine whether a prospective juror can be impartial-- notwithstanding the juror's admission under oath that he or she can be impartial. See* **Burt v. State**, *493 So.2d 1325, 1327 (Miss.1986) ("It is well founded that the trial judge has the discretion to excuse potential jurors for cause if the court believes the juror could not try the case impartially.") (citing cases); Miss. Code Ann. § 13-5-79 (1972).*

> *On procedural grounds, once the judge exercised his discretion and determined that the jurors probably could not be impartial, then the determination may not be assigned on appeal as an error:*

> *Any person ... who will make oath that he [or she] is impartial ... shall be competent as a juror in any criminal case.... Any juror shall be excluded however, if the court be of opinion that he [or she] cannot try the case impartially, and the exclusion shall not be assignable for error.*

> *Miss. Code Ann. § 13-5-79 (1972).*

*¶94. In the case before this Court, the State questioned the venire and asked if anyone would have trouble being fair and impartial. The following exchanges occurred:*

> *Ms. Perkins (State): I don't believe I could. My name is Helen Perkins. I don't believe I could select not guilty or guilty.*

> *Mr. Powell: Okay. Thank you, Ms. Perkins. You think you would have a hard time sitting in judgment?*

> *Ms. Perkins: Yes.*

> *Mr. Powell: Anyone else? Ms. Pepper?*

> *Ms. Pepper: Susie Pepper, same response.*

*Later in the voir dire, the defense asked the venire whether anyone would have trouble setting aside the fact that three white men were being tried in the death of a black man. Pepper stated that "since I know these people personally; I would feel mighty uncomfortable." However, she could set that aside to be fair. The State requested Pepper to be struck because she could not make a decision. The trial judge granted the challenge for cause due to Pepper's inability to make a decision.*

¶95. *Here the trial court, in its discretion, determined that Pepper was excused for cause. Accordingly, the law clearly does not allow an assignment of error for cause on appeal.* **Coverson**, *617 So.2d at 645; Miss. Code Ann. § 13-5-79 (1972). Notwithstanding this fact, Pepper stated she could set aside the circumstances of three white men being tried for the death of a black man. The ability to set aside the ethnic make-up of the parties involved in the case does not address Pepper's indecisiveness.*

¶96. *After reviewing the trial court transcript, this Court cannot say that the trial court was clearly wrong in its determination to exclude juror Pepper for cause based on her inability to sit in judgment and render a decision in the case presented at trial. This issue is without merit.*

### 14. Whether appellants were deprived of a fair trial by the prosecution's reference to Doc Caston's failure to make a post-arrest statement.

¶97. *The brothers argue that they did not have a fair trial. They allege that the prosecution repeatedly made reference to Doc's failure to make a post-arrest statement. This Court has set out the parameters concerning any comments pertaining to a defendant's post-arrest silence as follows:*

> *In* **Johnson v. State**, *596 So.2d 865 (Miss.1992), this Court held that the prosecutors's repeated comments on the defendant's post-arrest silence, after receiving Miranda warnings, [FN4.* **Miranda v. Arizona**, *384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] violated the due process clause of the Fourteenth Amendment, as held in* **Doyle v. Ohio**, *426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).* **Johnson**, *596 So.2d at 868-869.*

**Carr v. State**, *655 So.2d 824, 844-45 (1995).*

¶98. *In* **Dunaway v. State**, *551 So.2d 162, 163 (Miss.1989), this Court announced the test to be used to determine if there was improper comment by the prosecutor:*

> *The test to determine if an improper argument by a prosecutor requires reversal is whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice.*

¶99. *On direct examination of Doc by defense counsel, Doc stated the following:*

> *Q. Have you ever had an opportunity, or did you ever avail yourself the opportunity to tell the story that you just told here today?*

> *A. No. My lawyer which was William Barbour which I had went to a fellow that worked with him, and he advised me that --*

> *The State: Objection, Your Honor, to hearsay advise.*

*....*

*Q. (By [defense counsel]) Okay. I have some information that you made some oral statements while you were at the jailhouse. Do you remember saying anything at that time?*

*A. Yes, I do.*

*Q. You said something about Harold Crimm and you moving Rainey Pool; is that correct?*

*A. No, sir.*

*Q. What did you say back then about moving Mr. Pool?*

*A. What did I say back then?*

*Q. Yes. You testified today that you moved Mr. Pool.*

*A. That's right.*

*Q. But this old statement here says Harold Crimm and you moved him.*

*A. No, sir.*

*Q. Did you sign anything back then?*

*A. No, sir, I've never signed anything. I was just talking to the sheriff. I think I was talking to the sheriff.*

*Q. And made these statements?*

*A. Yes, we was just talking.*

*Q. Okay. Have you ever seen before this trial got started and your arrest, had you ever seen this written statement (indicating)?*

*A. (Witness examining document) No, sir, I have not.*

¶100. On cross-examination, the prosecution then questioned Doc about his version of events concerning Pool's death:

*Q. You talked to Sheriff Huffstickler on April the 14th of 1970?*

*A. I did.*

*Q. The date that's according to -- if that's who you talked to according to the notes in the police file it was 4/14/70.*

*A. Well, it was two or three dates later.*

*Q. Well, that's two days after the killing, the date the body was found, recovered from the river the day you talked to him. And you know what you said?*

*A. What did I say?*

*Q. "Doc stated he looked out the window, saw a Negro man taking something out of his truck. He went out there. The Negro cursed him. He stated that he hit the Negro and knocked him down. Doc and Harold Crimm drug the Negro to the corner of the building. Doc stated he went back inside." Now, that's all you told him about that at that time?*

*A. I was just talking to the sheriff.*

*Q. Right. Well you, according to what you have told this jury today, had witnessed a brutal violent murder, a man stomping Rainey Pool in the throat and inflicting injuries. And you were sitting there trying to get everybody back, trying to stop Dennis Newton from shooting him, trying to stop anybody from -- your brother, you grabbed your brother and tried to stop him from killing him. You were trying to get everybody back, but here's your opportunity to right the wrong that you had seen and to stop -- to take care of what you had seen. And what did you tell him. You didn't tell him any of that, did you?*

*A. Yes, I did.*

*Q. Well, where is it?*

*A. I didn't make statement.*

*Q. Yes, why didn't you?*

*A. Because my lawyer advised me not to make a statement.*

*Q. You didn't have a lawyer when you made this.*

*A. Yes, I did have a lawyer. William Barbour.*

*Q. On the 14th of April when this was made --*

*A. I had a lawyer before I was arrested.*

*Q. Oh, so you -- what, were you planning on Mr. Pool dying out there? Did you ask him in advance?*

*A. No, sir, I wasn't.*

*The Defense: Your Honor, he can't question him exercising his rights, and that's what he's trying to inject into this case.*

*The Court: Overruled*

*Q. My question is you didn't talk to him before you killing Rainey Pool, did you?*

*A. No, sir, I didn't.*

*Q. Okay. And did you tell anybody this story that you've told the jury today. In fact, you know,*

*in listening to you it almost appeared to me that you were trying to convince the jury that you and Rainey Pool were friends. Were y'all friends?*

*A. No, we weren't friends.*

*Q. Well, how come when you told the sheriff, you couldn't even call his name? How come you referred to him as, "I hit the Negro and knocked him down"?*

*A. Well, Negro then.*

*Q. "Harold and I drug the Negro to the corner of the building."*

*A. We did no -- me and Joe Watson did not drag him.*

*Q. I didn't say Joe, I said Harold.*

*A. I didn't say that. Is that signed?*

*Q. No, it's not signed?*

*A. Well, no, that's not signed because I didn't say that.*

*Q. Okay. You're just saying you're like Newton, that everybody wrote anything down about what you said, said it wrong.*

*A. I'm not like no one but myself.*

*¶101. Clearly, the defense opened the door and invited questioning of Doc about alleged statements given in 1970. "A defendant cannot complain on appeal of alleged errors invited or induced by himself." **Singleton v. State**, 518 So.2d 653, 655 (Miss. 1988) (citations omitted). See also **Evans v. State**, 547 So.2d 38, 40 (Miss. 1989); **Edwards v. State,** 441 So.2d 84, 90 (Miss. 1983). Furthermore, the prosecution was questioning Doc about inconsistencies in the testimony. The defense disputes this however and states that Doc's testimony was only inconsistent as to Crimm's participation in events.*

*¶102. The brothers also raise a few other times that the prosecution commented on whether the trial was the first time in which Doc told his version of events. However, the record reveals that the brothers did not object to any of the other comments. Accordingly, this Court need not address issues that are not objected to and preserved for appeal. "Failure to make a contemporaneous objection waives this issue for appeal purposes." **Gatlin v. State**, 724 So.2d 359, 369 (Miss 1998). "If no contemporaneous objection is made, the error, if any, is waived." **Walker v. State**, 671 So.2d 581, 597 (Miss. 1995) (citing **Foster v. State**, 639 So.2d 1263, 1270 (Miss. 1994)); **Hill v. State**, 432 So.2d 427, 439 (Miss. 1983). An appellate court is under no obligation to review an assignment of error when an objection was not made or when an objection was untimely. **Carr v. State**, 655 So.2d at 832. This issue is without merit.*

**15. Whether a thirty-year delay in prosecution violated the appellants right to speedy trial, due process and right against double jeopardy.**

*¶103. The brothers assert that the indictment and trial delay of almost thirty years denied them their right to due process and a speedy trial. Pool was killed on April 12, 1970. The brothers were indicted in 1970. However, the circuit court order granted nolle prosequi on July 20, 1970. It was not until July 31, 1998, that the brothers along with Newton and Watson were re-indicted. All three brothers were found guilty of manslaughter and sentenced to twenty years imprisonment. According to the brothers, this delay of almost thirty years prejudiced them. The brothers claim that dimming memories of both potential witnesses and themselves in addition to the unavailability of potentially exculpatory witnesses has prejudiced their cases.*

*¶104. While the brothers cite speedy trial, due process and double jeopardy violations in their issue caption, the brief only addresses the due process claim. In fact, the brothers point out that speedy trial assertions only apply to those periods of time when a defendant is charged with an offense. **Beckwith v. State,** 707 So.2d 547, 565 (Miss. 1998). The brothers were charged from April to July 1970 at which time an order of nolle prosequi was entered. Then in July, 1998 the brothers were re-indicted and had their trial in November 1999. Furthermore, a pre-indictment delay is generally predicated on the statutes of limitation. However, murder carries no such time limitation. See Miss. Code Ann. § 99-1-5 (2000). Accordingly, the brothers analyze the "oppressive delay" under the due process clauses of the United States and Mississippi Constitutions.*

*¶105. Nevertheless, we will address the speedy trial and double jeopardy issues. In accordance with **Beckwith v. State**, 707 So.2d at 568, the time between the nolle prosequi order in 1970 and the re-indictment of July 1998, is reviewed not under speedy trial rights, but rather by due process and the applicable statute of limitations.*

*¶106. This Court in **Beckwith** stated the following:*

> *The United States Supreme Court in **United States v. MacDonald**, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982) held:*

> *[T]he Speedy Trial Clause has no application after the government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.*

> *The Court in **MacDonald** also said:*

> *The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitation. 456 U.S. at 8, 102 S.Ct. at 1502. See also **United States v. Loud Hawk**, 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986).*

***Beckwith v. State**, 707 So.2d at 568. Based on case law, it is clear that once the order for nolle prosequi was entered on July 20, 1970, the Sixth Amendment right to speedy trial no longer had relevance to the case. From the point in which the 1970 order was entered until the time of re-indictment in 1998, the legal analysis is viewed by a due process and the statute of limitation claim rather than a speedy trial issue. **Beckwith v. State**, 707 So.2d at 568.*

*¶107. In regard to any double jeopardy claim, this Court has held that re-indictment for the same*

*offense after an order of Nolle prosequi does not bar prosecution.* **State v. Shumpert**, *723 So.2d 1162, 1164 (Miss. 1998)(citing* **Beckwith v. State**, *615 So.2d 1134, 1147-48 (Miss. 1992)). In* **Shumpert**, *this Court further found that:*

> *Legal precedent in the State of Mississippi is clear that the State can re-indict an accused for the same offense after an order of nolle prosequi has been entered. See* **State v. Kennedy**, *96 Miss. 624, 50 So. 978 (1910);* **State v. Thornhill**, *251 Miss. 718, 723, 171 So.2d 308, 310 (1965). In short, 'where a nolle prosequi is entered the particular case is at end on the docket, but this does not bar another prosecution for the same offense if commenced in the court where the case originated, as was done in the instant case.'"* **Walton v. City of Tupelo**, *229 Miss. 193, 196, 90 So.2d 193, 195 (1956).*

**State v. Shumpert**, *723 So.2d at 1164. Consequently, the brother's re-indictment in 1998 was not barred by the earlier circuit court order of nolle prosequi.*

*¶108. Since the speedy trial and 1998 indictment for the same offense are not relevant issues before this Court, we will direct the rest of the discussion to the assertion that the brothers were subject to an "oppressive delay" pursuant to an alleged violation of the right to due process.*

*¶109. The statute of limitations is considered along with due process in an undue delay claim. In the instant case, the brothers were indicted for murder. As noted above, murder has no statute of limitations. See Miss. Code Ann. § 99-1-5. Therefore, the brothers carry the burden of persuasion for the pre-indictment analysis of the undue delay and due process claim.* **Beckwith v. State**, *707 So.2d at 569 (citing* **Hooker v. State**, *516 So.2d 1349, 1351 (Miss. 1987)). Accordingly, the following two-prong test applies for demonstrating a due process violation:*

> *In* **United States v. Marion**, *404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971) and* **United States v. Lavasco**, *431 U.S. 783, 795-96, 97 S.Ct. 2044, 2051, 52 L.Ed.2d 752 (1977) the Supreme Court held that to sustain the burden of establishing that a due process violation has occurred, the defendant must show that (1) the preindictment delay caused actual prejudice to the defendant, and (2) such delay was an intentional device used by the government to obtain a tactical advantage over the accused. See* **United States v. Wehling**, *676 F.2d 1053, 1059 (5th Cir.1982). To establish that actual prejudice has occurred, this Court in* **United States v. Shaw**, *555 F.2d 1295 (5th Cir.1977), delineated certain factors to be considered in evaluating the effect of delay on a due process claim. According to Shaw, our "due process analysis must focus on factors such as the length of the delay, the reason for the delay and the prejudice which the delay may have caused the accused."* **Id**. *at 1299.*

**Hooker v. State**, *516 So.2d 1349, 1351 (Miss. 1987). This Court reaffirmed the two-prong test in its analysis in* **Beckwith**, *707 So.2d at 569.*

*¶110. The brothers assert under the first prong that the preindictment delay had prejudiced them. Among other things, the brothers cite the fact that memories are dimmed with time, and many witnesses are either dead or no longer available to testify. Further, the brothers claim that the case file no longer contains information regarding other witnesses who were present at the beating and could aid in the corroboration of the brothers' rendition of events. The brothers also argue that the physical evidence has degraded making the exact cause of death indeterminable. As to the second*

*prong of the test, the brothers assert that the prosecution delay was not based on any legitimate investigative need nor was there any new evidence.*

*¶111. During the hearing on this matter, no proof was provided to the trial court for a ruling. Accordingly, the issue is barred from further review by this Court. Notwithstanding the bar, the brothers still fail to overcome the two-prong test with the assertions in their brief. As this Court recognized in **Beckwith**, "[v]ague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from preindictment delay." **Beckwith**, 707 So.2d at 570 (citing **United States v. Harrison**, 918 F.2d 469, 474 (5th Cir. 1990)). As for the assertion that the physical evidence had degraded to the point that it is impossible to determine the exact cause of death, the testimony does not necessarily support this claim. The original physician that performed Pool's autopsy in 1970, Steckler, and the current State forensic pathologist, Dr. Hayne, both testified at trial. In addition to the original 1970 autopsy report, both physicians also reviewed some of Pool's tissue slides, which had been preserved from 1970 and recut from paraffin blocks. While there may have been some disagreement as to the exact cause of death, there was preserved physical evidence. Quite often the exact cause of death is undetermined, rather, as in this case, there is testimony that indicates the cause of death only within a degree of reasonable medical certainty.*

*¶112. Finally, the brothers have not proved an intentional delay to gain tactical advantage. The order stated that the State on its motion to the court requested permission to enter the nolle prosequi in 1970. The court cited that the request was "upon the grounds that witnesses who have heretofore given information and at present are unwilling to testify concerning the facts in each of said causes, constituting a failure in the State's evidence, and it appearing said motion is well taken and should be granted." The court papers, also, contain news articles which suggest that the district attorney's office examined Pool's death after a person claiming to be a relative of Pool called the district attorney's office. Once the district attorney began to look at the case, he found that the case was not fully processed. In another article, the district attorney indicated that it was his belief that a confession was erroneously suppressed by the circuit court in 1970. Clearly, there was no tactical advantage gained by the State in delaying the trials. This issue is without merit.*

**16. Whether the trial court erred in the instructions to the jury.**

*¶113. The brothers criticize the jury instructions for failing to adequately instruct the jury on aiding and abetting. Jury instructions 2-4[(6)], 8, 10, and 11 are in question.*

*¶114. "Jury instructions '[a]re to be taken collectively rather than be given individual consideration. So long as all the instructions read together adequately and properly instruct the jury on the issues, an individual instruction given to the jury will not constitute reversible error.'" **Coleman v. State**, 804 So.2d 1032, 1037 (Miss. 2002) (quoting **Detroit Marine Eng'g v. McRee**, 510 So.2d 462, 467-68 (Miss. 1987)). Where other instructions have both fairly and fully informed the jury, reversal is not warranted on appeal for an error in the instruction. **Id**. at 1038.*

*¶115. The jury instructions given at trial were as follows:*

*Jury Instruction No. 2*

*The Court instructs the jury that if you believe from the evidence in this case beyond a reasonable doubt that the State has proven all of the elements of Murder, to-wit:*

*1. that on or about April 12, 1970, in Humphreys County, Mississippi,*

*2. Rainey Poole, a human being, was killed and murdered, and*

*3. that such killing was done with the deliberate design to effect the death of Rainey Poole, and*

*4. was not in necessary self-defense,*

*and if you further believe from the evidence beyond a reasonable doubt that the Defendant, JAMES "DOC" CASTON, **was present, consenting, aiding and abetting or encouraging the commission of the said elements of said crime,** then you should find the Defendant, JAMES "DOC" CASTON, guilty of Murder.*

*Jury Instruction No. 8*

*The Court instructs the Jury that it is **not sufficient to find a person guilty because he merely was present at the time and place of the commission of a crime. His mere presence standing alone is not sufficient for him to be found to have committed the criminal act.** Accordingly, it is your sworn duty to find the Defendants, or any one of them, not guilty unless you find from the evidence beyond a reasonable doubt that he actively, knowingly and willingly participated in the murder of Rainey Pool. The Defendants, or any one of them, must act with knowledge and deliberation and have some cognizant involvement on his part to commit a crime in order to be found guilty of murder.*

*Jury Instruction No. 10*

*The Court instructs the Jury that proof of accomplice liability requires a showing not only that a defendant charged with a crime intended the behavior that is alleged to have aided, abetted or provided means or opportunity, but also that such a defendant intended that his behavior have the effect of promoting or facilitating the crime being committed.*

*The Defendants, or any one of their's, presence is one of the circumstances that the Jury may legitimately consider to determine whether he possessed that intent, however, **absent evidence of purposeful behavior, mere presence at the scene of the crime, even when coupled with knowledge that a crime is being committed, standing alone, is insufficient to establish accomplice liability**.*

*Jury Instruction No. 11*

*The Court instructs the Jury that in order to be convicted or murder under the theory that a defendant aided and abetted in the commission of the crime as charged in the indictment, then the State must prove beyond a reasonable doubt:*

*that at the time the killing occurred, James "Doc" Caston was **present and he shared a community of intent for the commission of the crime**, and if you believe from the evidence that he withdrew from the assault prior to the infliction of fatal blows to Rainey Poole or if you*

*believe that he abandoned the community of intent to kill the victim, then you must find James "Doc" Caston not guilty of murder.*

*(emphasis added).*

*¶116. As to jury instruction number 2, the brothers claim that the instruction should require that the defendant was present **and** aiding, abetting or encouraging the commission of the crime. To have the instruction state otherwise, according to the brothers, would instruct the jury to convict a defendant if he was present **or** aiding and abetting **or** encouraging the crime.*

*¶117. The instruction given at trial stated that the defendant "**was present, consenting, aiding and abetting or encouraging the commission of the said elements of said crime**..." (emphasis added). The brothers argue that the instruction as given could have found any of the three brothers guilty for merely being present when someone else committed the crime.*

*¶118. The record reveals that the brothers did not object to the instruction. The instruction language clearly provides two possibilities, the first being that a defendant must be present, consenting, and aiding and abetting. In the alternative, the defendant could also be encouraging the commission of the elements of the crime. Therefore, the brothers' argument is unpersuasive.*

*¶119. On the other hand, this Court has held that "[i]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." **Coleman v. State**, 697 So.2d 782 (Miss. 1997) (quoting **Collins v. State**, 691 So.2d 918 (Miss. 1997)). See also **Woodham v. State**, 800 So.2d 1148, 1156 (Miss. 2001); **Milano v. State**, 790 So.2d 179, 183 (Miss. 2001); **Pulphus v. State**, 782 So.2d at 1224. Following this well-settled law and when viewing the instructions as a whole, the brothers' contention as to instruction number 2 is unfounded.*

*¶120. Jury instruction 8 provides in part that "it is not sufficient to find a person guilty because **he merely was present** at the time and place of the commission of a crime. His **mere presence standing alone is not sufficient** for him to be found to have committed the criminal act." (emphasis added). Even though jury instruction 10 is an accomplice instruction, it is also helpful as to presence at the scene. This instruction provided, in part, that "absent evidence of purposeful behavior, **mere presence at the scene of the crime**, even when coupled with knowledge that a crime is being committed, **standing alone, is insufficient** to establish accomplice liability." (emphasis added). This Court looks at jury instructions as a whole. When reading these instructions together, it is clear that mere presence would not be enough for a conviction. As stated above instructions 2-4 are on their face clear, however, to the extent that instruction 2 nevertheless, may be viewed as an incorrect, reading all the instructions as a whole cured any inaccuracies.*

*¶121. The brothers also complain about instructions 8, 10, and 11. These instructions were given at the request of defense counsel. "It is a familiar rule of law that one may not complain of his own instruction." **Hall v. State**, 420 So.2d 1381, 1386 (Miss. 1982). This Court found that the "instruction was requested by the defendant, not by the State. We specifically held in **Musselwhite v. State**, 212 Miss. 526, 54 So.2d 911 (1951), that an accused may not complain of an instruction given at his request." **Burford v. State**, 372 So. 2d 254, 256 (Miss. 1979).*

*¶122. However, the brothers, also, raise the issue of ineffective assistance of counsel; therefore, we will address the merits of the defense instructions.*

*¶123. The brothers state that jury instruction 11 does not inform the jury what "community of intent" means and allows a conviction without finding that a defendant intended to aid and abet each element of the crime. Instruction 10, according to the brothers, also is unclear. They maintain that the instruction allows a defendant to be found guilty without finding that the defendant had the **intent** to aid and abet the elements of the crime. Finally, instruction 8 is challenged because "cognizant involvement" is meaningless; the words potentially created jury confusion as to the type of involvement necessary for a defendant to be guilty of aiding and abetting; it allows a conviction for knowing participation without also requiring **intent**; and a mere cover-up is not sufficient for conviction as a principal.*

*¶124. As for instructions 10 and 11 allegedly allowing a jury to find a defendant guilty without finding that a defendant intended to aid and abet each element of the crime, we are unpersuaded. When viewing instructions 10 and 11 in conjunction with instructions 2-4, which define the elements of murder, it is clear that the jury cannot convict without first determining that the elements of the "crime," murder, have been proven by the State beyond a reasonable doubt. Therefore, the jury cannot reach any of the other requirements in the instructions without first determining that the elements of murder are satisfied, and the defendant intended to aid and abet "said elements of said crime." In the alternative a manslaughter instruction was given to the jury to consider.*

*¶125. Instruction 8, by its terms requires the jury to find a defendant "not guilty unless you find from the evidence beyond a reasonable doubt that he actively, knowingly and willingly participated in the murder ...." and he "must act with knowledge and deliberation and have some cognizant involvement on his part to commit a crime." This instruction as well as instruction number 10 go well beyond a mere cover-up and require knowledge and intent.*

*¶126. When read as a whole, the instructions adequately informed the jury. This issue is without merit.*

### 17. Whether the appellants had ineffective assistance of counsel.

*¶127. On appeal, the brothers have counsel different than during their trial. Consequently, the issue of ineffective assistance of trial counsel is raised for the first time on appeal.*

*¶128. "Accusations of ineffective assistance of counsel are subject to the requirements set forth under **Osborn v. State**, 695 So.2d 570, 575 (Miss. 1997), and **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under both cases, this Court will not find counsel's assistance ineffective unless the accused (1) cites specific instances in which the attorney was so deficient that he essentially was not acting as counsel, and (2) shows that those errors deprived the accused of a fair trial. **Id**." **Washington v. State**, 800 So.2d 1140, 1145 (Miss. 2001).*

### A. Failure to develop viable defenses to the charges.

*¶129. The brothers argue that in addition to the conflict of interest, trial counsel also failed to develop viable defenses for the charges against them. The issue of the conflict of interest was*

*addressed in Issue 1. There was no conflict of interest, and, thus, we need not address that assertion further.*

*¶130. As to the viable defense argument, the brothers cite the example that trial counsel did not develop a self-defense argument for Doc. In addition, the brothers state that trial counsel's assertion that Pool's cause of death was by drowning rather than by fatal blows was not to any of their benefits. Specifically, because this alleged cause of death leaves Crimm without a defense since Watson placed the drowning on Crimm. Again, these instances do not amount to ineffective assistance of counsel.*

### B. Failure to call experts to support the defense that Pool died by drowning.

*¶131. The brothers assert that defense counsel's failure to call another expert to support that Pool had drowned was an indication of ineffective assistance of counsel. The two experts differed slightly in their assessment of the circumstances of Pool's death. There is no adequate showing by the brothers that the defense counsel's decision to not call his own expert was not sound trial strategy and prejudiced their case.*

### C. Failure to object to prejudicial evidence, instructions and prejudicial prosecutorial misconduct and other defense failure.

*¶132. To the extent that we have previously addressed any alleged errors by trial counsel, the issues will not be addressed again. As for a claim of the cumu lative effect of the ineffective assistance of counsel, there was no showing of ineffective assistance of counsel.*

### 18. Cumulative error

*¶133. As a last issue, the brother in conclusion to their brief also address cumulative error.*

> *The brothers assert that this Court may look at trial errors in terms of cumulative impact. The brothers contends that either singularly or cumulatively, the trial errors deprived them of a fair trial, due process and reliability in sentencing. This Court finds this contention without merit.*

*¶134. In **Wilburn v. State**, 608 So.2d 702, 705 (Miss. 1992), this Court held that "individual errors, not reversible in themselves, may combine with other errors to make up reversible error." The question that must be asked in these instances is whether the defendant was deprived of a "fundamentally fair and impartial trial" as a results of the cumulative effect of all errors at trial. **Id**. If there is "no reversible error in any part, so there is no reversible error to the whole. **McFee v. State**, 511 So.2d 130, 136 (Miss. 1987).*

*¶135. Based on the finding of no error by the trial court on each individual issue, there is no cumulative effect for all the alleged errors.*

### CONCLUSION

*¶136. The issues raised by the brothers are either procedurally barred or in the alternative without merit and do not support the basis for a reversal. Justice is timeless. Therefore, the judgment of the*

*Humphreys County Circuit Court is affirmed.*

*¶137. JAMES "DOC" CASTON: CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.*

*HAL SPIVEY CRIMM a/k/a HAROLD SPIVEY CRIMM: CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.*

*PITTMAN, C.J., SMITH, P.J., WALLER, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., AND COBB, J., CONCUR IN RESULT ONLY.*

*1. In 1998 the indictment named Doc, Charles, Crimm, Watson and Newton, whereas the 1970 nolle prosequi named Doc, Charles, Crimm, Watson and James Sandford (a.k.a. Hot). Hot is now deceased. It is not entirely clear from the record; however, it appears that the 1970 indictments were not all necessarily for murder.*

*2. Doc, Charles and Crimm are brothers. Crimm is the half brother of Doc and Charles.*

*3. Charles Caston died after the trial and the notice of appeal was filed.*

*4. Hot Sanford was called "Hot" because he had a hot temper.*

*5. Pool had only one arm.*

*6. These instructions are the same other than a substitution of Doc's, Charles's and Crimm's names.*