# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-01361-SCT

*LEIGH STUBBS AND TAMMY VANCE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/30/2001 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN M. COLETTE |
| | WALTER E. WOOD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | JAMES DANIEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/20/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE McRAE, P.J., DIAZ AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Having been indicted, tried, convicted and sentenced for conspiracy to possess morphine and to commit grand larceny, possession of morphine in an amount greater than twenty (20) dosage units, and aggravated assault, Leigh Stubbs (Stubbs) and Tammy Vance (Vance) appeal from the final judgment of the Circuit Court of Lincoln County, claiming that the circuit court erred in not granting either a continuance or severance, in not dismissing the case on the grounds that the State failed to prove each element of each of the crimes and in

allowing the expert testimony of a forensic odontologist, Dr. Michael West. Finding no error, we affirm the judgment of the circuit court.

**STATEMENT OF THE CASE AND**
**THE PROCEEDINGS IN THE TRIAL COURT**

¶2. On September 20, 2000, Leigh Stubbs, twenty years of age, and Tammy Vance, thirty-one years of age, were indicted in a multi-count indictment for conspiracy to possess morphine and to commit grand larceny, possession of morphine, in an amount greater than twenty (20) dosage units, and aggravated assault.[1] Nine (9) days before trial was scheduled to begin, Stubbs's attorney withdrew with Stubbs's consent. On June 20, 2001, Stubbs's new attorney filed his appearance the day trial was scheduled to begin and also filed a motion for continuance. The trial court denied the motion for continuance, but the trial was rescheduled for June 27, 2001.[2]

¶3. The trial was commenced on June 27, 2001, before a Lincoln County Circuit Court jury, Circuit Judge Mike Smith presiding. On June 30, 2001, Stubbs and Vance were found guilty of conspiracy to possess morphine and to commit grand larceny, possession of morphine in an amount greater than twenty (20) dosage units, and aggravated assault. They were each sentenced to serve terms of imprisonment as follows: Five (5) years as to Count One; twenty-four (24) years as to Count Two; and, twenty (20) years as to Count Three; provided, however, that the sentences in Count One were ordered to run concurrently with the sentences in Count Two, and the sentences in Counts One and Two were ordered to run

---

[1]*See* Miss. Code Ann. § 99-7-2; and, URCCC 7.07 and 7.08.

[2]There is nothing in the record reflecting why the trial date was moved from June 20, 2001 to June 27, 2001.

consecutive to the sentences in Count Three. Each defendant was also ordered to pay a $115,000.00 fine in addition to court costs and the victim's medical expenses. After their motions for a judgment notwithstanding the verdict, or in the alternative, a new trial were denied, Stubbs and Vance each timely filed a notice of appeal to this Court.

## SUMMARY

¶4.    On March 7, 2000, Kimberly Williams (Williams), twenty-one years of age, was found unconscious in a hotel room at the Comfort Inn in Brookhaven, Lincoln County. She was discovered by Stubbs and Vance who called the desk clerk for help after determining Williams was not breathing. An emergency team arrived on the scene and determined Williams was suffering from a drug overdose. She was immediately transported to the emergency room in Brookhaven and then later to Baptist Hospital in Jackson.

¶5.    After her arrival at the hospital, the medical staff discovered Williams had sustained severe injuries to her vaginal area. Law enforcement officials were notified that Williams had been sexually assaulted. Upon her transfer to Jackson, it was discovered that Williams had also suffered injuries to her head.  Williams recovered from her coma after twelve (12) days.

## FACTS

¶6.    Stubbs, Vance and Williams were in treatment for drug abuse at Cady Hill which is located in Columbus, Lowndes County.  Stubbs and Vance, who had been in the program longer than Williams, were in the second phase of treatment.  This entitled them to leave the facility after receiving weekend passes.  Stubbs and Vance had used a pass the weekend of March 3, 2000.  Upon their return to Cady Hill on Sunday, March 5, Stubbs and Vance

3

decided to leave the facility without completing the program. Williams asked if she could leave with them, and Stubbs and Vance agreed to give Williams a ride to her boyfriend's house in Summit, Pike County.

¶7.     On March 7, 2000, the night Williams was found, Stubbs and Vance both gave written, voluntary statements to the police. These statements were taken by Det. Noland Jones of the Brookhaven Police Department, and each statement was introduced into evidence at trial during his testimony.

¶8.     In Stubbs's voluntary statement, she stated she, Vance and Williams left Cady Hill, the drug treatment center in Columbus, Lowndes County on March 5, 2000. The women stayed in Columbus the first night before traveling to Summit, in Pike County, to take Williams to the house of her boyfriend, James Ervin. Stubbs also stated that she and Vance decided to leave after thirty minutes because the people at Ervin's house were "partying." After she and Vance left, Williams followed them and asked if she could leave with them. The women rented a motel room in Brookhaven around 9:30 or 10:00 p.m. on the night of March 6. Stubbs stated when she and Vance awoke the next morning, March 7th, they attempted unsuccessfully to wake up Williams. Because they thought she was only passed out, Stubbs and Vance left to get something to eat and came back and watched TV. Once they noticed Williams was not breathing, they called 911. Stubbs recalled Vance and Williams buying beer, but she could not remember how much Williams drank.

¶9.     In Vance's voluntary statement, she also stated she left the treatment facility in Columbus with Stubbs and Williams. Vance stated that as she and Stubbs were leaving, Williams asked for a ride to her boyfriend's house in Summit. They were in Summit for

4

approximately thirty minutes before Vance and Stubbs decided to leave. Vance stated Williams's boyfriend, Ervin, was smoking marijuana. Vance stated Williams left the house right after Vance and Stubbs. Williams asked if she could stay with them, and Vance told Williams she could probably stay with Vance at her mother's house. Vance noticed Williams came out of her boyfriend's house with a different purse. When the women arrived at the motel room in Brookhaven, Vance stated Williams was acting really drunk. The women had stopped for alcohol, but Vance said Williams was acting "worse than that." The women then went to sleep. After Vance and Stubbs woke up, they went to the store. At this point, Vance stated she noticed Williams was breathing. Later the women became aware that Williams had stopped breathing.

¶10. At trial the State called Detective Noland Jones to testify during its case-in-chief. Jones, a detective with the Brookhaven Police Department (BPD), was contacted regarding the incident at the Comfort Inn "a little after four p.m." He stated the initial call was about a drug overdose. Det. Jones remained at the station to question two witnesses, Stubbs and Vance. He testified each gave a written voluntary statement.

¶11. At approximately 8:00 a.m. the next morning, Det. Jones was informed that Williams had been sexually assaulted. Det. Jones then went to Jackson on March 8, 2000, to photograph Williams's body. He photographed Williams's swollen vaginal area and swollen nipples. Det. Jones also testified he photographed "passion marks" and bruises on Williams's right hip. Det. Jones stated that after the photographs were taken, Dr. Michael West was contacted to take comparison bite marks.

5

¶12. Det. Jones questioned Stubbs and Vance again on March 8, 2000, and the women stated they had been with Williams the entire time since leaving the treatment center in Columbus. On March 14, 2000, the BPD, through a search warrant, obtained the teeth impression of Vance and Stubbs. Those molds, along with the molds of James Ervin and his brother, Emmit, were given to Dr. West to compare to the bite marks found on Williams.

¶13. On March 15, 2000, a search warrant was also obtained for Stubbs's truck. The police took possession of the tool box found in the back of the truck, and the Mississippi Crime Lab examined the box for blood, hair and fibers. However, no blood or hair which could be linked to Williams was found in the tool box. Det. Jones also testified as to the surveillance tape from the Comfort Inn. He was questioned by the State as to what he saw on that particular tape. Det. Jones testified that he believed he saw Leigh Stubbs "step[] up in the back of the truck, raise[] the tool box and pick[] a person up out of that tool box and step[] off the truck and [enter] Room 109." Based on the videotape, Det. Jones stated he and Dr. West removed a latch from the tool box to compare to the marks found on Williams's head. Det. Jones also measured the distance between the latches on the tool box and found them to be thirty-seven (37) inches apart.

¶14. Det. Jones testified drugs were found in James Ervin's black bag which was found at the scene and brought to the hospital by the paramedics. Det. Jones testified he personally counted the morphine pills and found thirty-nine (39) tablets which were released to James Ervin since Ervin had a valid prescription for these drugs. At a later date, Det. Jones was able to question Vance again and record her statement. In this statement, Vance admitted to

taking some of the morphine after they left Summit. Vance also stated Williams was "popping–taking pills."

¶15. Helen Ervin, James Ervin's mother, testified she saw Williams on Monday evening, March 6, 2000, in her (Mrs. Ervin's) home in Summit, Pike County. Mrs. Ervin stated Williams did not appear to be in any kind of distress. Mrs. Ervin testified that Williams was with two women, but Williams only introduced her to one of the women. Mrs. Ervin was questioned regarding the women's behavior the night they came by the house. Mrs. Ervin testified the women made several trips from her son's room to the back porch because they claimed to be looking for a tent. She also stated each time they went on the porch, the women would turn out the lights and whisper. When asked if the women appeared to be working together, Mrs. Ervin responded in the affirmative.

¶16. James Ervin, Williams's boyfriend at the time of the incident, also testified he saw Williams with Vance and Stubbs on March 6, 2000. Ervin stated they arrived at approximately 7:15 or 7:20 p.m. He also stated Williams was not injured in anyway while she was in his home. Ervin testified the women told him they had all been drinking, and Williams had been driving because the other two were too drunk to drive and were unfamiliar with the area. Ervin stated at one point all three women were standing in the doorway to his room. Williams then asked him for the mail he had been collecting for her. As Ervin turned around to get the mail, he heard the screen door on the front of the house close. He then noticed his black bag in which he kept his medicine, money, checkbook and insurance cards was missing. Ervin's brother, Emmit, ran to the front porch, but their truck

7

was already down the street heading toward Highway 51. James testified he only heard the screen door slam once.

¶17. Ervin also testified that during that period of time, he was taking, pursuant to a valid prescription, MS Contin, which is 30 milligram morphine, as well as Xanax, Ambien and Ultram, all due to a severe accidental condition. He also stated there was $302.00 in the bag. Although some of the morphine was returned to him, Ervin testified that he was missing eight to twelve pills. No money was ever returned to Ervin. He denied smoking marijuana the night Williams, Stubbs and Vance came to his house.

¶18. Kim Howard worked as the desk receptionist at the Comfort Inn the nights of March 6 and 7, 2000. Howard testified Stubbs came to the motel around 10:00 p.m. the night of March 6, 2000. Howard stated Stubbs specifically requested a ground floor smoking room. Howard testified she was only able to rent Stubbs a ground floor non-smoking room, which Stubbs paid for in cash. Howard was questioned further by the State about Stubbs's purpose for a ground floor room, and in response, she stated that Stubbs informed her that her (Stubbs's) truck needed to be close to her room because of "some stuff" in the back of the truck, and Howard assured her that her truck and belongings would be safe due to the motel's video surveillance. Stubbs also told Howard that she "had a couple of them passed out in the truck" (which Howard interpreted to mean children asleep in the truck) and that Stubbs said she would be "dragging them" into the motel room, but they were "not dead or anything, they're just asleep."

8

¶19. Howard testified she was working again the next afternoon when she received a phone call that a woman in Room 109 was not breathing. Howard immediately called 911 and transferred them directly to the room.

¶20. Dr. Joe Moak testified he was asked to examine Williams after she was admitted to the emergency room in Brookhaven. During the treatment of Williams in Brookhaven, Dr. Moak and his medical staff discovered several injuries to Williams's body which had not been identified upon her initial exam. Dr. Moak noticed swelling and teeth and scratch marks around her nipples. Dr. Moak also noticed a "tremendous amount of swelling and bruising and almost a fresh kind of wound type of appearance" in her vaginal area. Dr. Moak next noticed red marks across her buttocks. Dr. Moak testified that these injuries as a whole were brutal. Dr. Moak immediately notified the BPD. In his medical opinion, Dr. Moak testified Williams most likely received these injuries 12 to 48 hours before she was admitted to the hospital.

¶21. The two paramedics who responded to the emergency call on March 7, 2000, Alisha Warren and Alton Shaw, were called to testify. Warren testified CPR was immediately administered once they arrived at the motel. Stubbs and Vance were questioned as to what could have caused the injury, but Warren testified each woman stated they did not know if Williams had taken anything. Each paramedic stated Stubbs and Vance then searched in Williams's purse and found it contained pill bottles. Both Warren and Shaw testified that Williams was not injured in any way while she was being transported to the hospital.

¶22. The State next called Dr. Michael West, a forensic odontologist, to testify as to bite marks discovered on Williams's hip. Over the objection of the defense, Dr. West was

9

qualified as an expert in the fields of forensic odontology and bite mark identification. Dr. West testified that on March 10, 2000, he was contacted by the district attorney's office concerning a woman who had been sexually abused. Dr. West was asked to travel to Jackson to photograph Williams's injuries. Dr. West testified that upon his examination of Williams's injuries that same day, he noticed swollen and bruised nipples, substantial trauma to the vaginal area and what appeared to be a bite mark on her right thigh. He immediately informed the district attorney's office of the bite mark and asked for dental molds of any possible suspects. After he received the dental molds of Stubbs, Vance, James Ervin and Emmit Ervin, Dr. West returned to the hospital on March 15, 2000, to compare the molds to the actual bite mark. One of his testing procedures was to press the dental molds literally into Williams's skin. After numerous tests, Dr. West testified he could not exclude Stubbs as being the person who caused the bite mark on Williams. Dr. West was able to state the other three molds did not match the bite mark.

¶23. Dr. West testified that on March 15, 2000, he was also informed by the medical staff that Williams additionally suffered from head injuries. He took pictures of the injuries and informed Det. Jones of the newly discovered injuries. While Dr. West was in Brookhaven with Det. Jones, he was able to view the surveillance video tape from the night the women checked in to the Comfort Inn. Dr. West testified that after numerous video enhancements, he was able to determine that Stubbs removed Williams from the tool box and carried her inside the motel room. Dr. West also noticed the latch on the tool box was similar to the injuries on Williams's head and lower thigh. He measured the distance between the two latches and the distance between Williams's injuries. Both distances were thirty-seven (37)

10

inches apart. Using his assistants, Dr. West was able to determine that a woman of Williams's size could be placed into the tool box and then removed by another woman.

¶24. The State's final witness was Kimberly Williams. Williams testified she did not have any memory of what happened to her after she left James Ervin's house in Summit. She testified she remembers someone taking Ervin's drugs, but she was unable to recall who it was. Williams also remembered she was not injured at the time she was visiting Ervin in Summit. She then testified to the extent of her injuries.

¶25. After the State's case-in-chief, both Stubbs and Vance moved for a directed verdict, and the trial court overruled the motions. During the defendants' case-in-chief, two Mississippi Crime Lab employees were called as witnesses. Amy Winters testified that she received items of clothing from Det. Jones on March 13, 2000. The clothing tested negative for semen. Melissa Schoene testified three items were submitted to the lab for trace evidence analysis. Schoene was asked to compare hair found in the tool box and hair found on a blanket located in the tool box to hairs collected in Williams's rape kit. Schoene testified the hairs from the tool box and blanket did not match Williams's hair.

¶26. The defense called their own expert witness, Dr. Rodrigo Galvez, to refute the claim of Dr. West that the mark on Williams's hip was a bite mark. Dr. Galvez, a forensic pathologist, testified Williams could not have fit in the tool box. He also stated Williams could not have sustained her head injuries from the tool box because the tool box was aluminum and the hinges do not allow the box to be closed with enough force. He did agree the thirty-seven inches coincided with the latches on the tool box and Williams's injuries. Dr. Galvez also testified there were many objects, other than teeth, that could have left the

11

appearance of the half moon or semicircle marks found on Williams's hip, such as a flashlight or the heel of a shoe. He stated when he first saw the video of the bite mark, he did think it could be an animal bite, but that was before he realized Dr. West had pressed the dental mold into the skin to compare the mold to the mark.  In order to preserve the actual mark, Dr. Galvez testified he would have performed the test to compare the molds to the bite mark differently than Dr. West.

¶27.    After the defense rested, both Stubbs and Vance renewed their motion for a directed verdict. Finding there was enough evidence for the case to be submitted to the jury, the trial court denied the motions. After the State offered no rebuttal testimony, the trial judge instructed the jury, which then heard the closing arguments of the attorneys, and then the case was submitted to the jury.

¶28.    On June 30, 2001, the jury returned a verdict of guilty as to all three counts against both Stubbs and Vance. On July 5, 2001, Stubbs filed a motion for a JNOV, or in the alternative, a new trial. The State filed two separate responses on July 13, 2001. One response was regarding the motion filed by Stubbs; the other response was regarding Vance's motion for a new trial. The record does not reveal a JNOV motion or a motion for a new trial being filed by Vance; however, we can confidently deduce from the State's actions and the trial court's actions that Vance did file such a motion since the record does contain the State's response to Vance's post-trial motion and the trial court's order specifically refers to Vance's post-trial motion. On July 18, 2001, Stubbs amended her motion for JNOV, or in the alternative, a new trial, and the State promptly responded to the amended motion. Both motions for a JNOV, or in the alternative, a new trial, were denied by the trial court.

12

¶29. Stubbs gave notice of her appeal to this Court raising the following issues:

**I.      WHETHER THE TRIAL COURT ERRED IN NOT GRANTING STUBBS A CONTINUANCE AFTER IT ALLOWED HER ATTORNEY TO WITHDRAW THE WEEK BEFORE TRIAL AND NEW COUNSEL ONLY HAVING EIGHT DAYS TO PREPARE.**

**II.      WHETHER THE TRIAL COURT ERRED IN ALLOWING MICHAEL WEST TO BE QUALIFIED AS AN EXPERT IN FORENSIC ODONTOLOGY AND BITE-MARK EVIDENCE UNDER THE CIRCUMSTANCES BELOW.**

**III.      WHETHER THE TRIAL COURT ERRED IN NOT GRANTING STUBBS'S MOTION TO EXCLUDE MICHAEL WEST'S TESTIMONY AND VIDEO TAPE DUE TO THE ALTERATION OF EVIDENCE, ENHANCEMENTS AND HIGHLY PREJUDICIAL RECREATION OF THE SAME.**

**IV.      WHETHER THE STATE FAILED TO PROVE EACH AND EVERY ESSENTIAL ELEMENT OF THE CRIMES CHARGED HEREIN, SPECIFICALLY THE JURISDICTIONAL ELEMENT OF WHERE THESE CRIMES WERE ALLEGED TO HAVE OCCURRED.**

¶30. On September 14, 2001, Vance also gave notice of her appeal to this Court raising the following issues:

**V.      WHETHER THERE WAS SUFFICIENT PROOF TO ESTABLISH PROPER JURISDICTION IN LINCOLN COUNTY CIRCUIT COURT.**

**VI.      WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING DEFENDANT'S MOTION FOR SEPARATE TRIALS.**

**VII.      WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING CUMULATIVE, OVERLY PREJUDICIAL, INADMISSIBLE TESTIMONY FROM THE STATE'S EXPERT WITNESS.**

**VIII. WHETHER THE GUILTY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

¶31. The issues of Stubbs and Vance which overlap will be discussed together as one collective issue by this Court. The remaining issues will be discussed separately.

## DISCUSSION

**I. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING STUBBS A CONTINUANCE AFTER IT ALLOWED HER ATTORNEY TO WITHDRAW THE WEEK BEFORE TRIAL AND NEW COUNSEL ONLY HAVING EIGHT DAYS TO PREPARE.**

¶32. Stubbs was indicted on September 20, 2000. On June 11, 2001, Stubbs's original retained attorney filed a motion to withdraw with the consent of Stubbs. The motion was granted on the same day. Trial was scheduled to begin on June 20, 2001. Stubbs's new retained counsel filed his entry of appearance on June 19, 2001. Along with his entry of appearance, defense counsel also filed a motion for continuance asking for thirty (30) additional days to prepare for trial. The trial was rescheduled for June 27, 2001, though, as mentioned earlier, the record does not reveal if this one-week continuance was in response to the motion for continuance.

¶33. Stubbs contends a "manifest injustice" resulted in the trial judge's failure to grant the motion for continuance for a longer period of time and his failure to make a record as to why he was denying the motion for continuance. Stubbs argues defense counsel did not have ample time to prepare for this multi-count, multi-defendant trial.

¶34. After the trial court continued the case for one week, the District Attorney's office provided full discovery to new counsel, went over each state witnesses' proposed testimony,

14

and shared some work product. The State argues defense counsel was well prepared and did a thorough job cross-examining the State's expert witness. There was no proffer in the record as to what would have been added to the defense had a continuance been granted, nor was there any proffer of any defense witnesses who were not available to testify. The State argues the trial court did not abuse his discretion in denying the motion for continuance.

¶35.     "The decision to grant or deny a continuance is left to the sound discretion of the trial court." *Lambert v. State*, 654 So.2d 17, 22 (Miss. 1995)(citing *Johnson v. State*, 631 So.2d 185, 187 (Miss. 1994); *Wallace v. State,* 607 So.2d 1184, 1190 (Miss. 1992); *Morris v. State,* 595 So.2d 840, 844 (Miss. 1991); *Fisher v. State,* 532 So.2d 992, 998 (Miss. 1988)). "Unless manifest injustice appears to have resulted from the denial of the continuance, this Court should not reverse." *Lambert*, 654 So.2d at 22 (citing *Hatcher v. Fleeman,* 617 So.2d 634, 639 (Miss. 1993)).

¶36.     Miss. Code Ann. § 99-15-29 (Rev. 2000) provides as follows:

> On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by  his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence by affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. No application for a continuance shall be considered in the absence of the party making the affidavit, unless his absence be accounted for to the satisfaction of the court. A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom.

¶37.    In *Lambert v. State*, 654 So. 2d 17 (Miss. 1995), this Court held the denial of the motion for continuance was an abuse of discretion.    In *Lambert*, the trial judge put the defendant to trial with his court-appointed attorney only seven (7) days after being arraigned on a six-count indictment.   Additionally, the prosecutor announced on the day of trial that he would proceed to trial on that day only on Count 2.   At his arraignment, Lambert informed his court-appointed attorney that he would attempt to hire his own attorney, and he in fact did contact another attorney, who agreed to accept employment if the case could be continued in order to fully investigate the underlying facts of the six-count indictment. The trial judge refused to continue the case, the "new" attorney did not therefore accept employment, the trial judge denied the court-appointed attorney's previously filed motion to withdraw, and the case proceeded to trial on Count 2.   After Lambert was found guilty on Count 2, the trial judge then set Count 3 down for trial one week later.   Lambert's court-appointed attorney requested a continuance because of trial commitments in other courts and because of the need for more time to fully investigate the remaining counts.   The trial judge denied the continuance, and the case proceeded to trial on Count 3, resulting in Lambert's conviction also as to Count 3.   *Id.* at 20-21. This Court held:

> This case does not involve just a single reason for the continuance but several. Standing alone, wanting to hire a different attorney would not warrant a continuance. This factor when combined with the extremely short period of time between the arraignment and the first trial, the "court appointed" counsel's previous trial commitments, the failure of the State to supply discovery prior to trial, and the problems of the multi-count indictment clearly demonstrates an abuse of discretion which resulted in Lambert not being afforded a properly prepared defense. Counsel's representations to the court that he was not adequately prepared should have been given greater weight.

16

> While there may be no demonstrative affidavit from Lambert of evidence and prejudice against him and while there may be no proof as is required under Miss. Code Ann. § 99-15-29 (Supp. 1972), it staggers the imagination that in the circumstances outlined above competent counsel could be expected to proceed to trial and provide a competent defense for any defendant.
>
> . . . While Mississippi need not provide any of its citizens with a perfect trial, she must provide all of her citizens with a fair one. Under the circumstances in this record, it was a clear abuse of discretion not to grant continuances and certainly it was an abuse of discretion not to allow privately hired counsel a continuance in order to step into the shoes of the court appointed counsel to defend Lambert.

*Id.* at 22-23.

¶38.    However, in *Plummer v. State*, 472 So. 2d 358 (Miss. 1985), the defendant's counsel (the local public defender) was allowed by the trial judge to withdraw from representation due to legitimate conflicts of interest, and the public defender was replaced by another local attorney who accepted the court's appointment with the understanding that he would be ready for trial on the trial date, which was only four days away.  On the day of trial, however, the newly appointed attorney did in fact file a motion for continuance. *Id.* at 359. Because the trial court found the record indicated the new attorney had not subpoenaed any witnesses, the new attorney failed to appear at the special venire, and the new attorney was aware of all of the problems involved with the case when he agreed to represent the defendant, the motion for continuance was denied. *Id.* at 360-61. Although this Court stated the trial court should have granted the motion for continuance, this Court was unable to ascertain from the record any injury suffered by the defendant. *Id.* at 361. Every witness the defense needed appeared and testified, and the prosecution's witnesses were thoroughly cross-examined. *Id.* There was no testimony offered in support of the motion for a new trial

17

as to how the defense could have been better prepared if the trial had been delayed. *Id.* at 362. This Court held the trial court's failure to grant the continuance was not prejudicial error. *Id.*

¶39.     Also, in *Gates v. State*, 484 So. 2d 1002 (Miss. 1986), the defense requested a continuance on the first day of trial on the ground that a material witness was absent. The motion set forth the expected testimony of the unavailable witness. *Id.* at 1006-07. Attached to the motion was a letter from the witness's doctor stating she was in the hospital and could not testify. *Id.* at 1007. The trial court overruled the motion finding there was no proof the witness was truly in the hospital. *Id.* During the trial, the defense made no attempt to introduce more evidence about their witness's absence. *Id.* When evidence came out at trial that the witness was in the hospital, the defense failed to renew the motion. *Id.* On motion for a new trial, the defense failed to present the witness for examination, nor did the defense present her affidavit. *Id.* This Court found there was no abuse of discretion in denying the continuance. *Id.* at 1007.

¶40.     In *Atterberry v. State*, 667 So. 2d 622 (Miss. 1995), Atterberry filed a motion for continuance in order to call Williams as a witness at trial. Atterberry never issued a subpoena for the unavailable witness. *Id.* at 632. Atterberry was offered assistance by the trial court and law enforcement officers to help locate the witness. *Id.* The trial court even provided Atterberry with a recess so that he could personally attempt to procure the witness for trial. *Id.* Atterberry's motion for continuance was heard the first day of trial. *Id.* Because he had issued no subpoenas, offered no proof of testimony and offered no proof that he had made any attempt to procure the witness's attendance, the trial court denied the motion for

continuance. *Id.* This Court determined the trial court was well within its discretion in denying the continuance based upon the facts of the particular case. *Id.*

¶41.    As this Court found in *Plummer*, *Gates* and *Atterberry*, there is no evidence in the record offered by Stubbs as to additional witnesses who were unavailable to testify, as to what would have been added to the defense had additional time been granted, or as to what due diligence was used to procure absent witnesses or absent documents pursuant to Miss. Code Ann. § 99-15-29. Because there is no evidence of prejudice suffered by Stubbs, this Court finds this issue to be without merit.

> **II.     WHETHER THE TRIAL COURT ERRED IN ALLOWING MICHAEL WEST TO BE QUALIFIED AS AN EXPERT IN FORENSIC ODONTOLOGY AND BITE-MARK EVIDENCE UNDER THE CIRCUMSTANCES BELOW.**
>
> **III.    WHETHER THE TRIAL COURT ERRED IN NOT GRANTING STUBBS'S MOTION TO EXCLUDE MICHAEL WEST'S TESTIMONY AND VIDEO TAPE DUE TO THE ALTERATION OF EVIDENCE, ENHANCEMENTS AND HIGHLY PREJUDICIAL RECREATION OF THE SAME.**
>
> **VII.    WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING CUMULATIVE, OVERLY PREJUDICIAL, INADMISSIBLE TESTIMONY FROM THE STATE'S EXPERT WITNESS.**

¶42.    The State offered Dr. Michael West as an expert in the fields of bite mark identification, wound analysis and alternate light photography. Over the defense's objection, Dr. West was accepted as an expert in the fields of bite mark evidence and forensic

19

odontology. Stubbs argues the trial court abused its discretion in admitting Dr. West as an expert and in further allowing Dr. West to testify beyond the narrow area for which he limited his qualifications. In addition to testifying to bite marks, Stubbs contends Dr. West was allowed to exceed his expertise in the areas of wound patterns, interpretation of photographs, and the effects of narcotics. Stubbs also argues the most prejudicial testimony elicited from Dr. West was a re-enactment with Williams. Stubbs argues because the trial court clearly abused its discretion in allowing Dr. West to testify as he did, this Court should reverse the convictions.

¶43. Stubbs filed several motions to exclude the bite mark evidence. One motion was filed on the grounds that this type of evidence was not readily accepted in the scientific community because it was unreliable and proper procedures have not been established.[3] The trial court denied this motion prior to trial. Stubbs also filed a motion to exclude a video tape produced by Dr. West and to exclude his testimony pertaining to the video tape because of its prejudicial nature. Stubbs alleged that Dr. West tampered with evidence by placing a mold of her teeth directly onto the hip of Williams where the original bite mark had been found. Stubbs also contends it was highly prejudicial for Dr. West to point to several alleged cigarette wounds found on Williams with an actual cigarette. Stubbs argues the trial court erroneously denied this motion without conducting a Rule 403 balancing test. *See* Miss. R. Evid. 403.

---

[3]*See* Miss. R. Evid. 702 and the Comment thereunder citing to the pre-rules case of **Hardy v. Brantley**, 471 So.2d 358, 366 (Miss. 1985).

¶44. Vance argues Dr. West's testimony should have been excluded because it was clearly beyond his field of expertise. Vance contends the opinion Dr. West gave regarding the teeth impressions of Stubbs was not an expert opinion. Dr. West stated "he could not find enough details in the mark to give it his highest opinion as an expert." Vance argues Dr. West's testimony was prejudicial because it concluded a question of fact; he was not able to testify to a reasonable degree of certainty; and, it did not help the jury clearly resolve an issue of fact. Although Dr. West was never qualified as an expert in video enhancement, he was allowed to offer testimony as to a videotape which he believed depicted Williams being carried out of Stubbs's truck into the hotel. Vance contends that Dr. West was also allowed to offer lay opinion testimony regarding alleged cigarette burns on Williams by holding a cigarette next to the wounds to conclude they matched. Vance also strongly contends Dr. West tampered with evidence by taking a dental mold of Stubbs and pressing it against Williams's leg and creating a bite mark that was not present before his procedure.

¶45. The State argues the trial court did not abuse its discretion in accepting Dr. West as an expert or in allowing Dr. West to testify at trial. The State argues this Court has previously recognized odontology as an acceptable area of professional and forensic expertise. The State contends that Dr. West followed the proper procedures for bite mark testimony, that the appearance of bite marks was testified to by others before Dr. West was called to consult on the case, and that exhibits also clearly showed the evidence of bite marks on Williams prior to Dr. West conducting his test regarding the dental molds of Stubbs.

¶46. The State also argues that Stubbs was allowed extensive cross-examination of Dr. West; that Stubbs also called her own medical expert, Dr. Rodrigo Galvez, to testify in her

21

behalf; that Dr. Galvez denied the impressions found on Williams were the results of bite marks; that Dr. Galvez also denied Williams's head injuries were from contact with the latches on Stubbs's tool box found in her truck; and, that, on the other hand, Dr. Galvez did agree that the marks on Williams resembled bite marks.

¶47.    With regard to the contention that Dr. West testified outside the area of his expertise, the State argues that the record shows this was not the basis of the objections made at trial; that the objection regarding the cigarettes was only to Dr. West testifying to "the history of cigarettes," not to using a cigarette to point to alleged cigarette burns; that the objection regarding the surveillance tape photographs was only to Dr. West using the term "blow" as well as a Rule 403 objection; that the objection was not regarding the video enhancement showing a body being carried into the hotel room; and, that the Miss. R. Evid. 403 objection was repeated when Williams was brought in before the jury to demonstrate the distance between the injuries on her head and side.

¶48.    Regarding the alleged tampering of evidence by Dr. West, the State argues Dr. West clearly explained his procedure to the jury. Although Dr. Galvez testified he would have used a different procedure, he did not testify that Dr. West employed an improper medical or forensic procedure.

¶49.    And finally regarding the contention that prejudicial testimony was elicited from Dr. West by using Williams to compare the injuries on her head to the latches from the tool box, the State points out that the trial court conducted the following Rule 403 balancing test:

> STATE:      . . . It's to show that the - - that the latches and all show that the injuries to her head and to her side was the same length as the marks on the tool box. It's just to show that.

22

COURT: Is it to compare the distance on the actual victim to the distance on the actual tool box?

STATE: On the latches of the tool box, yes, sir.

COURT: Then it would be appropriate. And the probability of it would outweigh any danger of mistake, prejudice, so your motion is overruled.

¶50. Rule 702 of the Mississippi Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

¶51. In *Howard v. State*, 701 So. 2d 274 (Miss. 1997), the bite mark testimony of Dr. West was also at issue. This Court, in citing *Spence v. Texas*, 795 S.W.2d 743, 750-51 (Tex. Crim. App. 1990), and *State v. Ortiz*, 198 Conn. 220, 502 A.2d 400, 403 (1985), provided the proper procedures for allowing bite mark testimony.

> There is little consensus in the scientific community on the number of points which must match before any positive identification can be announced. *Spence* at 750-51. Because the opinions concerning the methods of comparison employed in a particular case may differ, it is certainly open to defense counsel to attack the qualifications of the expert, the methods and data used to compare the bite marks to persons other than the defendant, and the factual and logical bases of the expert's opinions. Also, where such expert testimony is allowed by the trial court, it should be open to the defendant to present evidence challenging the reliability of the field of bite- mark comparisons. *State v. Ortiz,* 198 Conn. 220, 502 A.2d 400, 403 (1985).

701 So. 2d at 288.

¶52.    In ***Brooks v. State***, 748 So. 2d 736 (Miss. 1999), this Court affirmatively stated that bite mark evidence was admissible in Mississippi. Brooks accepted Dr. West as an expert in the field of forensic odontology. ***Id.*** at 739. However, Brooks attempted to challenge the reliability of bite mark evidence by stating there were no established guidelines in evaluating the evidence and the field of forensic odontology was not recognized by the American Dental Association as a specialty. ***Id.*** Brooks also called his own expert in forensic odontology, Dr. Harry Mincer, to testify as to the procedures used by Dr. West. ***Id.*** at 740. Although Dr. Mincer found consistencies between the mold of Brook's teeth and the bite mark on the defendant, he testified he could not state with medical certainty that Brooks made the bite marks. ***Id.*** Dr. Mincer also testified, based on his findings, he was unable to exclude Brooks as the person having made the bite marks. ***Id.*** This Court found that because Brooks was given the opportunity to challenge the reliability of the bite mark evidence as required by *Howard*, the trial court did not abuse its discretion in allowing Dr. West to testify. ***Id.***

¶53.    This Court has, on the other hand, criticized the testimony of Dr. West. In ***Banks v. State***, 725 So. 2d 711 (Miss. 1997), the defendant was found guilty of capital murder in the course of a robbery. The only evidence that tied Banks to the crime was the testimony of a witness who saw Banks on the victim's porch around the time she was assumed to have died and part of a bologna sandwich found at the crime scene. ***Id.*** at 713. Dr. West was called as the State's expert witness to testify that Banks's teeth matched the bite mark found on the sandwich. ***Id.*** Although Dr. West took several photographs of the sandwich, he later threw away the actual sandwich. ***Id.*** at 714. This Court stated "Dr. West's destruction of the sandwich was unnecessary and inexcusable." ***Id.*** at 716. This Court held the admission of

24

the evidence regarding the sandwich was fundamentally unfair since the sandwich had been destroyed, thereby depriving the defendant's expert the opportunity to actually inspect the sandwich. Thus, this Court reversed the conviction. *Id.*

¶54.    Although Stubbs and Vance both objected to Dr. West being qualified as an expert, they were each given the opportunity to challenge the reliability of the bite mark evidence as required by *Howard*. However, the defense failed to object to Dr. West testifying outside the area which he had been qualified as an expert except as to narcotics. The trial court found Dr. West's testimony, including testimony regarding bite marks, Williams's injuries, and video enhancement,  to be relevant and more probative than prejudicial. Because of the extensive record before this Court, because of the trial court's permitting extensive cross-examination of Dr. West by defense counsel, and because the defense called its own expert, Dr. Rodrigo Galvez, to rebut Dr. West's testimony, we cannot say that the trial court abused its discretion in admitting the testimony of Dr. West.  While, as noted above, this Court in *Brooks* made an affirmative statement that bite-mark identification is clearly admissible in our state trial courts, we in no way implied that Dr. Michael West was given carte blanche to testify to anything and everything he so desired.  From our cases wherein Dr. West has been involved, he has primarily been recognized by this Court to have been appropriately declared by the trial courts to be an expert in the field of forensic odontology.  This does not mean that Dr. West can indiscriminately offer so-called expert testimony in other areas in which he not even remotely meets the Miss.R.Evid. 702 criteria.  We caution prosecutors and defense attorneys, as well as our learned trial judges, to take care that Dr. West's testimony

as an expert is confined to the area of his expertise under Miss. R. Evid. 702. A different record in this case could have brought about different results.

**IV. WHETHER THE STATE FAILED TO PROVE EACH AND EVERY ESSENTIAL ELEMENT OF THE CRIMES CHARGED HEREIN, SPECIFICALLY THE JURISDICTIONAL ELEMENT OF WHERE THESE CRIMES WERE ALLEGED TO HAVE OCCURRED.**

**V. WHETHER THERE WAS SUFFICIENT PROOF TO ESTABLISH PROPER JURISDICTION IN LINCOLN COUNTY CIRCUIT COURT.**

¶55.   Stubbs argues the State failed to prove each element of the crimes charged. Each of the three charges was alleged to have occurred on or before March 6, 2000, in Lincoln County. Stubbs contends the proof at trial failed to established that all three crimes occurred in Lincoln County.[4]

¶56.   As to Count One, conspiracy to possess morphine and to commit grand larceny, Stubbs argues there was no proof of an agreement proven at trial. Stubbs also contends if the alleged grand larceny occurred, it must have occurred in Pike, not Lincoln, County. As to Count Two, possession of morphine in an amount greater than twenty (20) dosage units, Stubbs argues the State never proved she directly or circumstantially possessed the morphine pills, nor did the State prove the possession was in an amount greater than twenty (20) dosage units. James Ervin testified he was only missing eight to twelve pills of morphine. Stubbs also argues that no evidence was ever presented from a crime lab that the pills were actually morphine. Stubbs also makes the same jurisdictional argument as was made

[4]*See* Art. 3, § 26, Miss. Const., 1890.

26

regarding Count One. As to Count Three, aggravated assault, Stubbs contends that in addition to the State failing to prove where the aggravated assault occurred, the State, through their expert witness, put on proof that the assault did not occur in Lincoln County. Dr. West testified that he believed the surveillance tape showed Stubbs lifting Williams's unconscious body from Stubbs's truck and carrying her inside the motel. Stubbs contends if this statement is true, the crime must have occurred somewhere other than the motel in Lincoln County. Stubbs also argues the State failed to offer any physical evidence from the crime scene. If this brutal crime occurred in the motel room, Stubbs argues there would be blood, hair or fibers corroborating that the crime occurred there.

¶57. Vance argues the court never had proper jurisdiction to adjudicate the case because nothing in the record placed the location of the assault in Lincoln County. Vance argues testimony elicited at trial clearly shows all three women traveled through several counties during the time in question. Vance contends the trial court erred in not dismissing the case due to lack of jurisdiction.

¶58. The State argues the record indicates that all elements for all three counts were established at trial by the prosecution, including the jurisdictional element. The State contends there was substantial evidence in support of the jury's verdict. The State also argues that Vance did not raise the jurisdictional issue at trial.

¶59. In *Aldridge v. State*, 232 Miss. 368, 376, 99 So.2d 456 (1958), this Court was confronted with the issue of a crime having multiple elements which were committed in multiple counties.

27

Both the promise of marriage and the act of intercourse are essential elements of the crime, and, therefore, the crime was committed partly in one county and partly in another, and the jurisdiction of the crime became governed by Section 2429, Vol. 2A Recompiled, Mississippi Code of 1942, which provides as follows:

> 'When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.'[5]

*Id.*, 232 Miss. 368, 376, 99 So.2d 456, 460. This Court held:

> We think that where the crime is committed partly in one county and partly in another, the venue may be laid in either county without doing violence to the constitutional provision. It is manifest that the constitutional provision relates to crimes wholly committed in one county. Certainly it was not the intention of the framers of the constitution that one who commits a crime partly in one county and partly in another should not be amenable to the jurisdiction of the court in either county and should therefore be exempt from prosecution.

*Id.* at 377. *See also **Simmons v. State**, 568 So. 2d 1192 (Miss. 1990); **McKorkle v. State**,

305 So. 2d 361 (Miss. 1974).

¶60.    Regarding the elements necessary to prove conspiracy, this Court has held:

> The essence of a criminal conspiracy is two or more persons combining and agreeing to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully. Miss. Code Ann. § 97-1-1 (Supp. 1990); ***Taylor v. State***, 536 So.2d 1326, 1328 (Miss. 1988); ***Griffin v. State***, 480 So.2d 1124, 1126 (Miss. 1985); ***Norman v. State***, 381 So.2d 1024, 1028 (Miss. 1980). A criminal conspiracy is complete upon the combination, and the law does not require proof of an overt act in pursuance thereof. ***Ford v. State***, 546 So.2d 686, 688 (Miss. 1989). *The agreement need not be formal or express but may be inferred from the circumstances, particularly from declarations, acts, and conduct of the alleged conspirators. **Nixon v. State**, 533 So.2d 1078, 1092*

---

[5]*See* Miss. Code Ann. § 99-11-19.

(Miss. 1987); ***Barnes v. State***, 493 So.2d 313, 315 (Miss. 1986); ***McCray v. State***, 486 So.2d 1247, 1251 (Miss. 1986).

***Clayton v. State***, 582 So.2d 1019, 1022 (Miss. 1991) (emphasis added).

¶61. Helen Ervin testified at trial that when Stubbs, Vance and Williams were in her house in Pike County on the night of March 6, 2000, they made several trips to the back porch in attempts to search for a tent. However, she found this odd because the women were searching in the dark and she could hear them whispering. James Ervin testified when his bag, which was located in his home in Pike County, containing his drugs was returned to him, it contained only thirty-nine (39) dosage units of morphine. He stated there were at least eight to twelve tablets missing. Kim Howard, the receptionist at the Brookhaven, Lincoln County, Comfort Inn, testified Stubbs specifically asked her for a ground floor smoking room. Stubbs also told Howard she was going to be dragging someone into the room, but not to worry because they were not dead, only sleeping. Dr. Moak, Williams's treating physician at the hospital in Brookhaven, testified the injuries most likely occurred within a period of twelve to forty-eight hours of him treating Williams.

¶62. Based on the testimony submitted at trial, this Court finds there was sufficient evidence to establish all elements of the crimes, including jurisdiction. Therefore, we find this issue to be without merit.

**VI. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING DEFENDANT'S MOTION FOR SEPARATE TRIALS.**

¶63. Vance argues the trial court erred in not granting her motion to sever defendants and allowing for separate trials because the jury could not consider Vance's defense separate

29

from Stubbs's defense. Vance contends the State used the evidence from one defendant against the other in order to obtain convictions against both defendants. Vance also contends she was irretrievably linked to Stubbs by the State's treatment of both defendants as a single defendant or lesbian couple.

¶64. The State argues the record does not show Vance ever objected to any testimony about evidence of a lesbian relationship between Vance and Stubbs. The State also argues that although a severance of defendants was mentioned in the motion for a new trial by Stubbs, there was nothing mentioned concerning Vance or any of the issues she raises in this appeal. The State also claims Vance's appeal is lacking in merit. Vance's defense was not an attempt to exculpate herself while implicating Stubbs. The State argues sufficient evidence supported the trial court's denial of the motion for a severance.

¶65. The trial judge has the discretion to grant a severance of defendants if it is necessary to promote a fair determination of the defendant's guilt or innocence. *Stevens v. State*, 717 So.2d 311, 312 (Miss. 1998).

> In *Duckworth v. State*, 477 So.2d 935, 937 (Miss. 1985), this Court stated that there are a number of criteria to be used to determine if the denial of a motion for severance is proper. These criteria are whether or not the testimony of one co-defendant tends to exculpate that defendant at the expense of the other defendant and whether the balance of the evidence introduced at trial tends to go more to the guilt of one defendant rather than the other. Absent a showing of prejudice, there are no grounds to hold that the trial court abused its discretion. *Id.* at 937. *Hawkins v. State*, 538 So.2d 1204, 1207 (Miss. 1989); *See Gossett v. State*, 660 So.2d 1285, 1289 (Miss. 1995); *Tillman v. State*, 606 So.2d 1103, 1106 (Miss. 1992) ("the trial court has the discretion to grant a severance if it is necessary to promote a fair determination of the defendant's guilt or innocence"); *Johnson v. State*, 512 So.2d 1246, 1254 (Miss. 1987); *Price v. State*, 336 So.2d 1311, 1312 (Miss. 1976); URCCC 9.03; Miss.Code Ann. § 99-15-47 (Supp. 1994).

*Id.* at 312-13. URCCC 9.03 also provides:

> The granting or refusing of severance of defendants in cases not involving the death penalty shall be in the discretion of the trial judge.
>
> The court may, on motion of the state or defendant, grant a severance of offenses whenever:
>
> 1. If before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or
>
> 2. If during trial, upon the consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offence.

¶66.　In *Carter v. State*, 799 So. 2d 40 (Miss. 2001), both Carter and his co-defendant Pierce maintained throughout the trial that neither person had anything to do with the robbery or murder of Williams. Each defendant testified in his own behalf claiming an alibi defense, and neither defendant accused the other of being the guilty party. *Id.* at 45. This Court found the trial court did not abuse its discretion in denying a severance because the evidence introduced at trial went to the guilt of both defendants and neither defendant attempted to exculpate himself at the expense of the other. *Id.*

¶67.　In *Caston v. State*, 823 So. 2d 473 (Miss. 2002), three brothers, James "Doc" Caston (Doc), Charles Ernie Caston (Charles) and Hal Spivey Crimm (Crimm) were convicted of manslaughter. All three brothers' motions for severance were denied by the trial court. *Id.* at 485. At trial, Doc was the only defendant to testify. His testimony did not exculpate himself at the expense of either of his brothers. *Id.* at 488. This Court held because there was no evidence the brothers were prejudiced by the denial of the severance, the trial court did not abuse its discretion in denying the motion for severance. *Id.*

31

¶68. Neither Vance nor Stubbs testified at trial; however, their previous voluntary statements were admitted into evidence. There is no indication in the record that Vance or Stubbs ever tried to exculpate themselves at the expense of the other defendant. The evidence presented at trial went to the guilt of both Vance and Stubbs. Although evidence was introduced to indicate Stubbs most likely caused the bite mark on Williams's hip, other evidence presented did not exclude Vance from causing any of Williams's other injuries.

¶69. As noted earlier, although there is no record of Vance filing a separate motion for JNOV or, in the alternative, a new trial which raises this issue of severance, we will address this issue because the State responded to a motion and the trial court specifically denied the motion in his order. For whatever reasons, this motion is not in the court record. However, we safely conclude such a motion exists; therefore, we have jurisdiction to address the issue. However, considering this issue on its merits, Vance's issue lacks merit. *See **Foster v. State***, 639 So.2d 1263, 1271 (Miss. 1994)("Although this Court need not look further after finding a procedural bar, this Court also, alternatively, may review the merits of the underlying claim knowing that any subsequent review will stand on the bar alone."). Because there is no evidence either Vance or Stubbs was prejudiced by the denial of the severance, this Court finds the trial court did not abuse his discretion in denying the motion for severance.

## VIII. WHETHER THE GUILTY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶70. Vance argues her convictions for conspiracy to possess morphine, possession of morphine and aggravated assault are against the overwhelming weight of the evidence. First, Vance argues there was no testimony presented to prove she conspired with Stubbs and

Williams aside from someone seeing them whispering at James Ervin's home. Second, Vance argues the material used to charge her with possession of morphine was returned to James Ervin before the tablets could be independent analyzed at a laboratory. Vance also contends no evidence was offered that she was ever in actual or constructive possession of the alleged morphine. Vance further states the prosecution failed to prove the amount of morphine possessed by Vance. Third, Vance argues there was no evidence that Vance assaulted Williams. Vance contends all of the evidence presented by the State proved Stubbs was the defendant responsible for assaulting Williams.

¶71. The State initially argues Vance is procedurally barred from raising several of these issues on appeal because she did not raise these before the trial court. The State contends Vance did not object to the issue of where the conspiracy was formed, lack of chemical analysis, testimony concerning morphine, nor were these issues raised in the motion for a directed verdict. However, the State contends substantial evidence was proven by the prosecution in support of Vance's convictions. Vance is no doubt procedurally barred from making some these arguments, and we hold; however, as mentioned above, this Court will review the merits of the issue knowing any subsequent review will stand on the bar alone. *See Foster*, 639 So.2d at 1271.

¶72. It is well established that matters regarding the weight of the evidence are to be resolved by the jury. *Neal v. State*, 451 So.2d 743, 758 (Miss. 1984). A reversal is warranted only if the trial court abused its discretion in denying a motion for new trial. *Sheffield v. State*, 749 So.2d 123, 127 (Miss. 1999) (citing *Gleeton v. State*, 716 So.2d 1083

33

(Miss. 1998)). This Court's standard of review for the determination of whether a jury verdict is against the overwhelming weight of the evidence is as follows:

> "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." ***Herring v. State***, 691 So.2d 948, 957 (Miss. 1997); ***Jackson [v. State]***, 689 So.2d 760, 766 (Miss. 1997). Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal. ***Herring***, 691 So.2d at 957; ***Benson v. State***, 551 So.2d 188, 193 (Miss. 1989) (citing ***McFee v. State***, 511 So.2d 130, 133-134 (Miss. 1987)).

***Pleasant v. State***, 701 So.2d 799, 802 (Miss. 1997). Therefore, if the verdict is against the overwhelming weight of the evidence, then a new trial is proper. ***May v. State***, 460 So.2d 778, 781-82 (Miss. 1985).

¶73. As stated previously under Issues IV and V, the prosecution established all elements of the crimes. Vance failed to object to these issues at trial, and she also failed to raise these issues in her motion for a directed verdict. As stated previously, there is no record of a motion for a JNOV or, in the alternative, a new trial having been filed by Vance in the court papers.

¶74. This Court finds the evidence presented to the jury was legally sufficient and the guilty verdicts were not against the overwhelming weight of the evidence. Therefore, this issue is without merit.

## CONCLUSION

¶75. For the foregoing reasons, the judgment of the Lincoln County Circuit Court is affirmed as to both defendants on all counts in the indictment.

34

¶76.   **COUNT I: CONVICTION OF CONSPIRACY TO POSSESS MORPHINE AND GRAND LARCENY AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED AS TO EACH APPELLANT.   COUNT II:   CONVICTION OF POSSESSION OF MORPHINE AND SENTENCE OF TWENTY-FOUR (24) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED AS TO EACH APPELLANT.   COUNT III:   CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED AS TO EACH APPELLANT.   COUNT I SHALL RUN CONCURRENTLY WITH COUNT II.   COUNTS I AND II SHALL RUN CONSECUTIVELY WITH COUNT III. APPELLANTS SHALL EACH PAY COURT COST; $115,000.00 FINE (5,000.00 FOR COUNT I, $100,000.00 FOR COUNT II, AND $10,000.00 FOR COUNT III);ONE HALF MEDICAL EXPENSES INCURRED BY THE VICTIM AS A RESULT OF THIS CRIME; ONE HALF THE EXPENSE OF THE MEDICAL EXPERT TESTIMONY; ONE HALF THE EXPENSE OF GATHERING MEDICAL RECORDS NEEDED FOR TRIAL; AND ONE HALF THE COST OF SERVICE OF PROCESS FOR WITNESSES.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, EASLEY AND GRAVES, JJ., CONCUR.**